[Nos. B189151, B191036. Second Dist., Div. Eight. Mar. 15, 2007.]

FRANCISCO BENACH, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

838

COUNSEL

Law Offices of Shields Kowalski and Russell Shields for Plaintiff and Appellant.

Liebert Cassidy Whitmore, J. Scott Tiedemann and Jolina A. Abrena for Defendants and Respondents.

OPINION

BOLAND, J.—

## SUMMARY

This appeal is the latest flareup in litigation that began in 1993 when appellant Deputy Sheriff Francisco Benach was fired by respondent Los

Angeles County Sheriff's Department (Department), after he allegedly assaulted another deputy. This appeal involves the Department's alleged breach of an agreement resolving litigation that arose out of that and other incidents. It also involves a violation of the Public Safety Officers Procedural Bill of Rights Act (POBR), Government Code section 3300 et seq., allegedly committed by the Department by virtue of an involuntary transfer of Benach from the bureau where the Department's pilots are based.

The trial court found no violation of the POBR, and granted the Department's motion for summary adjudication. The court also found that the gist of Benach's action sought equitable relief, and denied his request for a jury trial on claims for breach of contract and breach of the covenant of good faith and fair dealing. Trial was conducted over a span of about three months, after which the court found in favor of the Department on both claims, and subsequently awarded costs to the Department. Benach filed these appeals, which we consolidated.

On the appeal from the judgment, we find no error and affirm. Summary adjudication was properly granted on the cause of action for violation of the POBR, a jury trial was properly denied on contract-related claims seeking primarily equitable relief, and Benach failed to prove the Department breached the settlement agreement in any respect. Regarding the cost award, we affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Benach has been employed by the Department since 1973. From 1981 until late October 2001, Benach served at the Department's Aero Bureau at the Long Beach Airport (Aero or Aero Bureau) as a pilot. In 1993, Benach was fired after he allegedly assaulted another deputy. Benach appealed, and was ordered reinstated by the Los Angeles County Civil Service Commission. The Department sought a writ overturning that order and refused to reinstate Benach pending the outcome of that proceeding. Benach sued, alleging violations of his civil rights and the POBR. Both actions were ultimately resolved by a November 23, 1998 settlement agreement (agreement) between Benach and the Department.[1] The alleged breach of the agreement is the subject of this appeal.

The portion of the agreement at issue states;

"5. Within one (1) year of this agreement, the Department shall provide Benach the following training to be qualified as Pilot in Command (PIC) in

---

[1] Respondent County of Los Angeles is actually the party to the agreement. For purposes of discussion, we refer to respondents, collectively, as the Department. A law firm was also party to the agreement, but that portion of the settlement is not at issue.

the following aircraft: Fixed Wing Airplanes, Long Ranger Helicopter and 600 Notar; and Load Lifting Training in the 500 Series aircraft. In addition, the Department shall provide Benach training as PIC in the Sikorsky H3 by June 30, 2000. Benach shall be checked out and provided ongoing currency in the above described aircraft in accordance with Bureau Policy . . . .

"However, Benach's successful completion of such training shall not imply any right to a specific flight assignment or to a type of flight assignment. Such assignments are in the sole discretion of the Department. Benach will be allowed the opportunity to fulfill missions (either for overtime or as a regular assignment) in the aircraft named in paragraph five (5) on the same terms and conditions as apply to similarly qualified pilots.

"In addition, within eighteen (18) months of the execution of this agreement, Benach will be provided aircraft accident investigation training."

The agreement was negotiated by Benach, with assistance of counsel. Jeffrey Hauptman, the Department's former director of personnel and employee relations, was the Department's sole representative in the settlement negotiations. During the negotiations, Hauptman received some input from James DiGiovanna, the commanding officer of Aero Bureau, regarding technical and aviation jargon, and the timeframe within which the Department could reasonably conduct the training it had agreed to provide.

Benach alleges the Department breached the agreement in six respects. It (1) failed to provide training in the Cessna 414 on a timely basis; (2) failed to send Benach to helicopter accident investigation school; (3) failed to qualify Benach as PIC in the Sikorsky H3 (H3) helicopter; (4) failed to provide "currency"[2] in the aircraft identified in paragraph 5 of the agreement; (5) failed to afford him the opportunity to fulfill missions "either for overtime or as a regular assignment" in the aircraft identified in paragraph 5 of the agreement on the same terms and conditions applied to similarly qualified pilots; and (6) transferred Benach to another station and assignment in violation of the implied condition he would remain at Aero absent wrongdoing.

On October 25, 2000, approximately 16 Department employees met with Sheriff Lee Baca. The employees presented the Sheriff a memorandum signed by more than 30 Departmental personnel complaining that Benach had created an "unsafe and hostile work environment" at Aero by, among other

---

[2] "Currency" is the Aero Bureau requirement that each pilot complete a certain number of rides per type of aircraft per year. Aero Bureau pilots may only operate bureau aircraft in which they are both qualified and current.

things, engaging in "reckless and unsafe flying," "actual physical violence," and "threatening behavior towards his fellow deputies" and some of their families.

Following the meeting, the Sheriff ordered an internal affairs investigation to address the allegations levied against Benach. Pending completion of the investigation, Benach was temporarily transferred out of Aero in October 2000. However, he continued to be paid at the rate of a Bonus II pilot, and continued to receive ongoing currency in certain aircraft during the temporary transfer.

The investigation of the allegations against Benach occurred between November 2000 and late July 2001. More than 75 current and former employees were interviewed in the course of the investigation. On October 25, 2001, former Division Chief Kenneth Bayless notified Benach he had been permanently reassigned out of Aero Bureau because Bayless had concluded that "overwhelming evidence" indicated Benach's presence at Aero "coincide[d] with a less-than-harmonious working environment." Bayless informed Benach his decision was not based on a determination of fault or a finding Benach had violated any policy. He stressed the transfer was nonpunitive, and informed Benach he would continue to receive the same rate of pay. Although he continued to be paid at the rate of a Bonus II pilot in his new position as a detective, Benach was no longer eligible for flight duties once he was no longer assigned to Aero.

On February 11, 2003, Benach filed this action for breach of contract, breach of the covenant of good faith and fair dealing, and violation of the POBR.[3] In the operative third amended complaint, he sought specific performance ordering the Department to provide immediately the promised training, and an injunction to stop the Department from taking further punitive action against him.

The Department moved for and obtained summary adjudication on the cause of action for violation of the POBR.

Over Benach's objection, a jury trial was denied and a bench trial conducted on the contract claims from January 19 through March 8, 2005. The court issued a statement of decision on December 6, 2005, and entered judgment in favor of the Department. This appeal followed.

[3] Benach also sued for conspiracy and violation of his right to equal protection under the federal Constitution through the vehicle of 42 United States Code section 1983; those claims are no longer at issue.

## DISCUSSION

1. *Summary adjudication was proper on the claim of violation of the POBR.*

Benach contends the trial court erred by granting the Department's motion for summary adjudication on his cause of action for violation of the POBR for two reasons: first, triable factual issues precluded granting that motion; and second, his reassignment from a Bonus II helicopter pilot position to a position routinely held by a Bonus I detective was a punitive demotion in violation of the POBR. The Department insists the motion was properly granted because undisputed facts show Benach was neither demoted nor subjected to a punitive transfer. The Department is correct.

■ Regarding misconduct committed by a peace officer, the POBR provides "no punitive action . . . shall be undertaken for any act . . . or other allegation of misconduct if the investigation of the allegation is not completed within one year of the public agency's discovery by a person authorized to initiate an investigation of the allegation of [the] . . . misconduct. . . . In the event that the public agency determines that discipline may be taken, it shall complete its investigation and notify the public safety officer of its proposed disciplinary action within that year, except . . . [¶] . . . [¶] [i]f the investigation involves more than one employee and requires a reasonable extension." (Gov. Code, § 3304, subd. (d)(4).) "Punitive action" includes "any action that may lead to . . . demotion, . . . reduction in salary, . . . or transfer for purposes of punishment." (Gov. Code, § 3303.)

■ Benach insists triable factual issues remain outstanding as to whether his involuntary transfer out of Aero was a punitive demotion. He is mistaken. Undisputed evidence in the record establishes Benach retained the same rank and rate of pay in his new position as detective. The record also reveals the transfer was not imposed for a punitive purpose. Rather, a yearlong investigation revealed the working environment at Aero Bureau evinced a lack of harmony and cooperation among employees when Benach was at Aero. However, after Benach was temporarily transferred pending the outcome of the internal affairs investigation, the friction dissipated and the working environment at Aero became noticeably more harmonious, civil and respectful. Accordingly, even though Benach was found not to have violated any policy or to have committed any wrongdoing, Bayless reasonably determined it was both expeditious and in the Department's best interests to make Benach's removal from Aero permanent, rather than to transfer numerous other employees to new posts.

Relying on *Brown v. City of Los Angeles* (2002) 102 Cal.App.4th 155 [125 Cal.Rptr.2d 474], Benach argues "[c]ourts have found adverse employment

action in transfers to positions of the same pay and rank where the new positions lacked the prestige or other advantages of the former jobs." In *Brown*, a police officer challenged the city's decision to downgrade his rank from Police Officer III to Police Officer II and to reduce his salary, actions the city admitted were "punitive" within the meaning of the POBR and entitled the plaintiff to an administrative appeal. (*Brown v. City of Los Angeles*, at p. 171.) *Brown* does not advance Benach's cause. Unlike *Brown*, Benach does not claim any due process violation, and did not suffer a downgrade in rank or rate of pay. *Brown* does not address the issue of whether a reassignment, without a concomitant loss of rank or pay, constitutes punitive action under the POBR.[4] Benach's reliance on *Reed v. City Council of City of Roseville* (1943) 60 Cal.App.2d 628 [141 P.2d 459] is also misplaced. First, the case was decided long before the POBR provision at issue became operative. More to the point, it involves the dissimilar circumstance in which the public agency readily admitted the employee's transfer "effect[ed] a demotion" notwithstanding the fact that he retained the same pay rate. (*Reed v. City Council of City of Roseville*, at p. 633.) Here, the trial court correctly determined the absence of an issue of fact that Benach was demoted.

The decision in *Orange County Employees Assn. v. County of Orange* (1988) 205 Cal.App.3d 1289 [253 Cal.Rptr. 584] (*OCEA*), is instructive. In that case, the director of a county facility for delinquent boys was transferred from a post he held for 16 years based on a supervisor's concerns about his performance. Notwithstanding the concerns that precipitated his replacement, the director retained the same compensation and benefits and even received a raise shortly after his transfer. (*Id.* at p. 1291.) The director was denied an administrative hearing under the POBR, based on the county's contention the transfer was a routine measure, not intended as discipline or punishment. (205 Cal.App.3d at p. 1292.) The appellate court affirmed, rejecting the director's contention the transfer was necessarily punitive because it resulted from concerns about deficiencies in his performance. The court stated: "Deficiencies in performance are a fact of life. Right hand hitters sit on the bench against certain pitchers, some professors write better than they lecture, some judges are more temperamental with criminal cases than others. The manager, chancellor or presiding jurist must attempt to find the proper role for his personnel. Switching Casey from shortstop to second base because he can't throw to first as fast as Jones is not in and of itself a punitive transfer." (*Id.* at p. 1294.)

In *OCEA*, the court aptly observed there is a difference between a transfer intended to punish for a deficiency in performance versus one that is intended

---

[4] Benach also asserts he lost compensation by virtue of the fact he was not eligible for overtime after his transfer. However, the record contains no evidence supporting Benach's claim he had an entitlement to overtime.

to compensate for deficient performance. Such was the case here. Although Bayless did not find Benach violated any departmental policy, he did conclude his continued presence at Aero was impliedly deficient in the sense it was not conducive to a cooperative, productive working relationship with approximately 30 other members of that bureau's personnel, and exercised his supervisorial discretion to make a change to address that unique circumstance to best serve the Department's needs. The reassignment was effected without any loss of pay or rank to Benach. Notwithstanding Benach's assertion that his work as a detective is less heroic than his job as a pilot, the record supports the trial court's conclusion Benach suffered no punitive action. Summary adjudication was properly granted.[5]

2.  *Denial of jury trial on breach of contract and covenant of good faith claims.*

The trial court granted the Department's motion and conducted a bench trial on the causes of action for breach of contract and breach of the covenant of good faith and fair dealing. Benach insists he was entitled to a jury trial on these claims. He is mistaken.

It is a well-established principle that " '[t]he jury trial is a matter of right in a civil action at law, but not in equity.' [Citations.]" (*C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 8 [151 Cal.Rptr. 323, 587 P.2d 1136].) In classifying a given action as legal or equitable, the court looks to its substance, viz., the nature of the rights at issue and the remedy sought. The label attached to a complaint or cause of action does not control. (*Fearey v. Gough* (1943) 61 Cal.App.2d 778 [143 P.2d 711]; *Paularena v. Superior Court* (1965) 231 Cal.App.2d 906, 911 [42 Cal.Rptr. 366].) "Although . . . 'the legal or equitable nature of a cause of action ordinarily is determined by the mode of relief to be afforded' [citation], the prayer for relief in a particular case is not conclusive [citations] . . . ." (*C & K Engineering Contractors v. Amber Steel Co., supra*, 23 Cal.3d at p. 9; see *Walton v. Walton* (1995) 31 Cal.App.4th 277, 287 [36 Cal.Rptr.2d 901].) Rather, the "practice of the court is to examine also the allegations of the complaint in reaching its determination as to the kind of action the plaintiff is bringing." (3 Witkin, Cal. Procedure (4th ed. 1996), Actions, § 119, p. 186, italics omitted.) An accurate indication may often be gleaned from a combined review of the caption, prayer and allegations. (*Ibid.*)

---

[5] Our resolution renders it unnecessary to resolve the parties' alternative arguments regarding the viability of Benach's POBR claim. (See *Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65 [195 P.2d 1] [appellate courts will not address issues whose resolution is unnecessary to disposition of the appeal].)

In addition, because Benach failed to prevail on his claim of violation of the POBR, we need not address his claim of entitlement to attorney fees under the "private attorney general" theory. (See Code Civ. Proc., § 1021.5.)

Our review of the caption, allegations and prayer of Benach's third amended complaint readily reveals that the "gist" of this action is equitable. The first cause of action is entitled "breach of settlement agreement and for specific performance thereon." In allegations related to that claim and the cause of action for breach of the covenant of good faith and fair dealing, Benach complains vociferously about lost flight and currency training he suffered as a result of the Department's continuing breaches, and his inability to obtain such training or to participate in rewarding workplace activities unique to those performed by pilots at Aero Bureau. He asserts "[m]onetary damages are insufficient to compensate [him] for [the breaches] by DEPARTMENT, and accordingly specific performance and injunctive relief to prevent future harassment is requested in addition to any other remedies the court deems just and proper." In his prayer for relief on each of these claims, Benach seeks an injunction enjoining the Department from erecting further impediments to the promised pilot training, and "specific performance of the agreement, by means of an Injunction directing [the Department] to immediately provide the training promised in the settlement agreement."

Clearly, the gist of this action seeks specific performance of the 1998 settlement agreement to compel the Department to provide the flight training specified. "A claim for specific performance is an equitable one." (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1240 [19 Cal.Rptr.3d 416]; see *Caira v. Offner* (2005) 126 Cal.App.4th 12, 27 [24 Cal.Rptr.3d 233].) Benach's prayer for "incidental monetary damages" is insufficient to convert an equitable action into one at law for which a jury trial is required. (See *C & K Engineering Contractors v. Amber Steel Co., supra*, 23 Cal.3d at p. 11; *Olson v. Foster* (1941) 42 Cal.App.2d 493, 498 [109 P.2d 388] [request for incidental relief will not alter the gist of an action].) An action seeking specific performance and/or injunctive relief is, of course, equitable in nature. (*Crouser v. Boice* (1942) 51 Cal.App.2d 198, 204 [124 P.2d 358] [no right to jury trial in contract action seeking specific performance]; *Arciero Ranches v. Meza* (1993) 17 Cal.App.4th 114, 125 [21 Cal.Rptr.2d 127]; 3 Witkin, *supra*, Actions, § 120, p. 187.) Indeed, even Benach, who appeared in propria persona below, expressly conceded this action is predicated on a claim of breach seeking specific performance of the agreement when he told the court the primary "theory of [his] case has always been that working at Aero Bureau is a unique irreplaceable position that cannot be found in the civilian sector. [And] [n]o amount of money can allow [him] to fly as a police officer doing rescues." Any damages he sought were merely incidental to Benach's principal request for specific performance and injunctive relief. The trial court did not err in

ordering a bench trial on the claims for breach of contract and the covenant of good faith and fair dealing.[6]

### 3. *Contract interpretation and the standard of review.*

■ On issues of contractual interpretation where there is no conflicting extrinsic evidence, the appellate court is not bound by the trial court's interpretation and will decide the issue de novo. (*City of Chino v. Jackson* (2002) 97 Cal.App.4th 377, 386 [118 Cal.Rptr.2d 349]; *Southern Pacific Land Co. v. Westlake Farms, Inc.* (1987) 188 Cal.App.3d 807, 817 [233 Cal.Rptr. 794].) However, even in a contract that appears facially unambiguous, an ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is reasonably susceptible. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40 & fn. 8 [69 Cal.Rptr. 561, 442 P.2d 641]; *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1140–1141 [234 Cal.Rptr. 630].) Ambiguity exists when a contractual provision is susceptible of two or more reasonable constructions. (*Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920].) The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554].)

The initial question of whether an ambiguity exists is one of law. If the court determines a contract is ambiguous, a party is entitled to introduce extrinsic evidence to aid the interpretation of the contract. (*Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554–555 [32 Cal.Rptr.2d 676]; *Pacific Gas & Electric Co. v. Zuckerman, supra,* 189 Cal.App.3d at pp. 1140–1141.) Where, as here, the interpretation of a contract turns on the credibility of conflicting extrinsic evidence, the trier of fact must determine the meaning of language in the contract. (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912–913 [75 Cal.Rptr.2d 573].) If substantial evidence supports that interpretation, we will not overturn it on appeal. (*Roden v. Bergen Brunswig Corp.* (2003) 107 Cal.App.4th 620, 625 [132 Cal.Rptr.2d 549].)

The meaning of key terms and phrases actually or allegedly implied in the settlement agreement is hotly disputed. Although it never explicitly said so, the statement of decision makes it clear the trial court found the agreement was ambiguous in material respects. We agree. The meaning of key phrases

---

[6] We need not resolve the Department's contention that Benach would be barred from recovery of damages on his contract-related claims because he failed to comply with the Tort Claims Act. Our conclusion, as discussed in part 3, that Benach failed to prove the elements of his contract-related claims, renders moot any issue of his potential entitlement to incidental damages. (See *Palermo v. Stockton Theatres, Inc., supra,* 32 Cal.2d at p. 65.)

such as "qualified as PIC" and "aircraft accident investigation training," among others, is not defined. These terms are reasonably susceptible to more than one interpretation. Both parties presented extrinsic evidence that those terms and others may be subject to various meanings in the context of aviation parlance or Aero Bureau policy. Accordingly, the court considered voluminous amounts of frequently contradictory extrinsic evidence to aid its interpretation of key contract terms. It construed the instrument as a whole and in light of the circumstances of the case. (See Civ. Code, § 1641; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) For reasons discussed below, we conclude substantial evidence supports the court's reasoned conclusions. (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746–747 [131 Cal.Rptr. 873, 552 P.2d 1169] [where parties present conflicting evidence to resolve interpretation of writing, so long as judgment is supported by substantial evidence, evidentiary conflict must be resolved in favor of the prevailing party and any reasonable construction of the writing by the trial court will be upheld]; *Appleton v. Waessil, supra*, 27 Cal.App.4th at p. 556 [same].)

4. *Benach's specific claims of breach of contract.*

a. *The Department's failure to provide timely training in the Cessna 414.*

Under the terms of the agreement, the Department agreed to provide Benach training to enable him to qualify as PIC in the Cessna 414, a fixed wing aircraft, by November 23, 1999. Benach was trained and qualified as PIC of that aircraft, even though those tasks were not completed until February 4, 2000.

■ Benach contends the Department could have met the contractual deadline, but chose instead to assign him routine duties rather than provide the training. The trial court found Benach failed to meet his burden "to prove calculable damages as a result of the delay in completing the training in the Cessna 414." As a result, no actionable breach was shown. That finding was correct. At trial, Benach expressly conceded any harm he suffered by virtue of the Department's delay was not quantifiable: "I was certainly injured to some extent, but I cannot qualify it or quantify it." Mere delay, without proof of actual harm suffered as a result of the delay, is not an actionable breach. (See Judicial Council of Cal. Civ. Jury Instns. (2006) CACI No. 303; see also *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388 [272 Cal.Rptr. 387] [imposition of liability for breach of contract requires an unexcused failure to perform and resulting damages].)

### b. *The Department's failure to train Benach to investigate helicopter accidents.*

The agreement requires the Department to provide Benach with "aircraft accident investigation training." Benach attended a course entitled "Aircraft Accident Investigation" in June 2000, which covered only the investigation of airplane accidents. Benach insists he always intended to be trained to investigate both airplane and helicopter accidents on a level equivalent to that of the most qualified aircraft accident investigator, and the Department breached the agreement by failing to train him to investigate helicopter accidents. The trial court correctly found otherwise.

The record does not reflect the parties mutually intended that Benach would receive both airplane and helicopter accident investigation training. Indeed, even Benach, who the court found "actively participated in the wording of the settlement agreement," acknowledged the document "was not clearly worded" in this regard. Several factors support the court's conclusion. First, the integrated agreement nowhere states Benach would be trained to investigate helicopter accidents. Evidence at trial established there was a separate course of training for helicopter—as opposed to airplane—accident investigations. Second, Hauptman testified no portion of any request or demand made by Benach regarding the training he wanted to receive was excluded from the agreement. If Benach had initially demanded training to conduct helicopter accident investigations, the demand would have been addressed in the agreement. Third, although DiGiovanna understood Benach wanted to receive a level of accident investigation training "the same as the most qualified aircraft accident investigator" at Aero, no deputy at Aero was qualified to investigate helicopter accidents in 2000. Fourth, the contention that the term "aircraft" in the agreement was meant to include planes and helicopters is belied by evidence that Benach himself employed the term "aircraft" to mean different things at different times.[7] Finally, DiGiovanna's offer to provide helicopter training as additional consideration to Benach in the course of negotiations to resolve a dispute regarding the belated Cessna training supports the Department's contention it did not intend to provide that training initially. Substantial evidence supports the trial court's conclusion that the Department satisfied its obligation to provide "aircraft accident investigation training" to Benach.

### c. *The Department's failure to train and qualify Benach as PIC of the H3.*

Benach asserts the Department breached the portion of the agreement which requires it to "provide Benach training as PIC in the Sikorsky H3 by

---

[7] Evidence at trial revealed that, in other contexts, Benach interpreted "aircraft" to exclude helicopters.

June 30, 2000," and states he "shall be checked out . . . in the above described aircraft in accordance with Bureau Policy . . . ." Specifically, Benach contends the Department was required to train him as a PIC of the H3 and to confer on him the status of PIC, with all privileges attendant that designation. He maintains the Department breached the agreement by failing to qualify him as PIC of the H3 by requiring he pass a final "check ride." The trial court found otherwise, a finding with which we concur.

Vast amounts of trial time were devoted to testimony regarding the Department's obligation under the agreement to train Benach as an H3 pilot in connection with Benach's pilot training for the H3. Benach produced evidence, by way of his own testimony and that of two other deputies, that the phrase "training to be qualified as PIC" refers to training that results in a pilot being qualified to operate an aircraft, not merely training that results in the "possibility" of a qualification. DiGiovanna testified he understood Benach did not just want to be "trained" as PIC of the H3, but to be qualified to fly as PIC of the H3 to enable him to participate in missions performed in that helicopter.

However, DiGiovanna, who was commanding officer of Aero Bureau at all times pertinent, also testified that, in Aero parlance, "training as PIC" meant an individual was trained to be responsible for the operation of an aircraft, and that the Department could not guarantee a designation as PIC unless and until a pilot received an endorsement from a certified flight instructor. For most aircraft, a flight instructor was vested with discretion to decide when a pilot achieved a level of proficiency sufficient to justify an endorsement, and no final evaluation flight was required. However, Aero Bureau policy for the H3 is different. DiGiovanna testified that, for the H3, a pilot is required to take a final evaluation or "check flight" which, if conducted successfully, will result in his endorsement by a certified flight instructor.[8] Aero's March 31, 2000 training outline for the H3 was admitted in evidence. The outline requires each pilot to take a check ride and receive the endorsement of a certified flight instructor.

Deputy Jeff Steck, Benach's H3 flight instructor, testified he trained numerous pilots at Aero who ultimately qualified as PIC of the H3, each of whom underwent a final check flight at the conclusion of his training. With

---

[8] Benach points to the training and practices of another deputy, Bruce Stephenson, Aero's current training officer for the H3, to support his argument that no "check flight" is required for that helicopter. That reliance is misplaced. Stephenson said he never took a formal "check ride" to qualify as PIC of the H3. However, he received his training from a private company in the Sikorsky 61, a civilian equivalent of the H3. Moreover, even though Stephenson does not conduct a single "consolidated finalized checkride" for student pilots, he does perform a series of evaluations, each of which a pilot must successfully complete in order to receive an endorsement as PIC of the H3.

the exception of Benach, each deputy passed his final evaluation flight. Benach failed his check flight on June 17, 2000. Steck testified that Benach failed to conduct a records check before the flight, and performed several maneuvers during the flight in an unqualified manner.[9] Following that failed check flight, Steck recommended Benach receive two weeks of additional training, and anticipated he would be ready to take another check ride by mid-July 2000. DiGiovanna agreed and offered Benach the remedial training.

On June 23, 2000, Benach filed a grievance claiming the Department breached its obligation under the agreement to provide him training to be qualified as PIC of the H3. DiGiovanna attempted to resolve the grievance informally by offering Benach additional training in the H3 beyond the June 30, 2000 deadline, and offering to contact the Federal Aviation Administration so a neutral flight examiner could evaluate the H3 training provided to Benach. Benach rejected the Department's compromise offer, choosing instead to pursue the formal grievance.

On this record, we reject Benach's contention that the agreement's use of the phrases "training to be qualified as pilot in command" of the H3 meant the Department was required to authorize him to fly the H3 as the PIC and perform all missions associated with that aircraft. The Department presented ample evidence it provided Benach with the training required by the agreement to become qualified as PIC of that helicopter in accordance with Aero policy. Benach was given an opportunity to demonstrate his proficiency as and entitlement to the status of PIC of the H3 in a final evaluation ride, but failed to do so. As a result, he was deemed unqualified for endorsement by a certified flight instructor. Benach was offered additional training and a chance to try again, but he rejected those offers. It is erroneous to assert the Department was required under the agreement to place a pilot in command of an aircraft if that individual, even after receiving a full complement of training, lacks the skill and qualifications that necessarily attach to such a designation. The requirement would force the Department to extend an invitation to potential disaster. The Department was required to provide the level of training which placed Benach at the "doorstep" of the status he sought. A demonstration of sufficient proficiency to justify crossing the threshold was up to Benach. Substantial evidence supports the trial court's

---

[9] Benach asserts Steck failed to endorse him as PIC of the H3 in retaliation for filing a grievance challenging Steck's placement on an eligibility list of Aero pilots. The evidence is otherwise. Benach filed the grievance on June 23, 2000, the same day as Steck became aware of it and six days after Benach failed the check flight. The record contains no hint Steck had advance notice Benach intended to file a grievance. Benach insists Steck's animus preceded that flight because, among other things, he resisted Steck's efforts to be a pilot at Aero. The record also does not support this contention. The trial court specifically found Benach failed to prove retaliation.

determination that the Department provided the training the agreement required. Responsibility for Benach's failure to pass the check ride—and his refusal to accept the Department's good faith offer to let him re-prepare and try again—rests with him. The Department did not breach the agreement by failing to qualify·Benach as PIC of the H3 by June 30, 2003.

### d. *The Department's failure to provide "ongoing currency."*

Benach asserts the Department breached the agreement in that, "[f]ollowing his 'permanent' transfer of October 26, 2001, [he] was denied <u>any</u> flight training, including currency training to maintain his skills, in <u>any</u> aircraft." Apart from a bare iteration of the Department's contention that his transfer out of Aero meant he was no longer entitled to training or flight opportunities, Benach's opening brief fails to support his assertion by citation to argument or authority. This conclusory presentation, without pertinent argument or an attempt to apply the law to the circumstances of this case, is inadequate. We therefore treat the issue as abandoned and do not address it on the merits. (*Strutt v. Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866, 873 [105 Cal.Rptr. 395] ["An appellate court is not required to consider alleged errors where the appellant merely complains of them without pertinent argument."].)

It is a fundamental rule of appellate review that the judgment appealed from is presumed correct and " ' "all intendments and presumptions are indulged in favor of its correctness." ' [Citation.]" (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610 [109 Cal.Rptr.2d 256].) An appellant must provide an argument and legal authority to support his contentions. This burden requires more than a mere assertion that the judgment is wrong. "Issues do not have a life of their own: If they are not raised or supported by argument or citation to authority, [they are] . . . waived." (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 [31 Cal.Rptr.2d 264].) It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness. When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273].)[10]

---

[10] Benach devotes more attention to this point in his reply brief. It is too late. An appellant's duty attaches at the outset. It would be unfair to permit an appellant to wait to argue his substantive points until after the respondent exhausts its only opportunity to address an issue on appeal. As a general rule, points not addressed until a reply brief will not be considered unless good reason is shown for failing to address them earlier. (*Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507, 529, fn. 21 [49 Cal.Rptr.2d 793].) None has been shown here. We treat the issue as abandoned.

e. *The Department's failure to provide opportunities to fly missions.*

Benach insists the Department breached the agreement when, after permanently transferring him out of Aero in October 2001, it denied him the "[o]pportunity to fulfill missions '[e]ither for overtime or as a regular assignment' in the aircraft named in paragraph five" on the ground that only pilots at Aero flew missions and since he was no longer assigned to that bureau, he could no longer fly missions. The trial court concluded the Department did not breach this provision of the agreement. It found that, while at Aero, Benach was permitted to fulfill missions on terms and conditions equivalent to those applied to similarly qualified pilots. However, once assigned to another bureau, those opportunities were no longer available to him or anyone else assigned outside Aero. Substantial evidence supports that conclusion.

The agreement obligates the Department to act in accordance with Aero policy and provide Benach the opportunity to fulfill missions "on the same terms and conditions" as it applies to other similarly situated pilots. Bayless and DiGiovanna each testified Aero policy requires the assignment of deputies to that bureau in order to fly its aircraft. Accordingly, once Benach was permanently removed from Aero, he was no longer similarly situated to equivalently qualified pilots; he was no longer assigned to the only bureau from which sheriff's deputies may be assigned to fly Aero aircraft or missions.

Benach argues the Department's "self-serving logic" serves only as a "disguise for a means to avoid performance of the Agreement." Again, the trial court found otherwise. It concluded that Bayless made a rational decision to transfer Benach to best serve the Department's needs, and Benach's lateral transfer from Aero was neither a punitive action nor a demotion. That finding is amply supported by the evidence. There is no evidence Bayless's decision to transfer Benach was motivated by a desire to avoid the Department's contractual obligations. Indeed, with the exception of the dispute over the H3 training, the Department had fulfilled the training obligations owed to Benach before his permanent transfer was effected.[11] The Department did not breach the agreement by refusing to permit Benach to fly missions in Departmental aircraft after he was permanently transferred out of Aero.

---

[11] When he was temporarily transferred, Benach sued the Department challenging the legality of that move. The superior court ruled the reassignment did not violate the POBR and denied Benach's request for an injunction. That ruling is final.

f. *The Department's breach of an alleged implied promise Benach would remain at Aero indefinitely.*

Benach claims the sixth and final breach of the agreement committed by the Department was its alleged breach of an implied promise to permit him to remain indefinitely at the Aero after completing flight training so he could participate on the same basis as similarly qualified pilots in missions performed by aircraft at that bureau.

Benach's argument is premised entirely on his own intention, which he never articulated when the agreement was negotiated, and speculation by DiGiovanna who said "one [can] only assume that would have been the intent" when asked if it had not been "implied [or] expected that [Benach] would remain at Aero Bureau after receiving the training so [he] could fulfill the missions . . . ." However, DiGiovanna did not participate in the substantive negotiations leading to the agreement.

Hauptman was the sole representative for the Department during the negotiations. Although he consulted with DiGiovanna, the consultations were limited to technical questions, the amount of training Benach would receive, and establishing a reasonable timeframe for completion of the training. Hauptman was quite clear that DiGiovanna did not participate in negotiating any term of the agreement.

More to the point, Hauptman explicitly testified that Benach's assignment to Aero was never discussed at any point and "the issue never crossed his mind." Hauptman also testified it was never contemplated that the agreement constituted a commitment by the Department for the remainder of Benach's career. Rather, while Benach was assigned to Aero, the agreement represented only the Department's commitment to provide him a certain amount of training over a specified period of time, and to treat him like other similarly situated pilots with regard to assignments and overtime opportunities. To that end, the agreement specifically provides that Benach's "successful completion of [the] training shall not imply any right to a specific flight assignment or to a type of flight assignment. Such assignments are in the sole discretion of the Department." Hauptman assumed Benach would remain at Aero during the training. However, that issue and the issue of Benach's assignment once the training was completed were never discussed, let alone agreed upon, and Hauptman never gave the point much, if any, thought. Benach testified that, during negotiations, he expressed his intention to remain at Aero until he retired. Still, he concedes the agreement reflects no promise on the part of the Department that he would remain at Aero for any period of time. And, as Benach points out, Hauptman said none of Benach's requests was excluded from the settlement agreement. The logical inference from the evidence is

that, even if Benach always hoped and intended to remain at Aero, he neglected to mention that fact or to extract from the Department a promise to ensure his hope would be realized.

On this conflicting evidence, and the express language of the agreement, the trial court reasonably concluded the Department "never made an express or implied promise not to transfer Benach out of Aero Bureau absent wrongdoing," and did not breach the agreement by permanently transferring Benach out of Aero in October 2001. Ample evidence supports those findings.[12]

## 5. *Benach has not shown the award of costs was an abuse of discretion.*

Benach contends the trial court abused its discretion by denying his motion to tax costs as to the Department's photocopying costs for its trial exhibits, messenger service and court reporter fees, because the Department failed to satisfy its burden of demonstrating these costs were reasonable and necessary. The contention lacks merit.

In awarding costs, a trial "court's first determination . . . is whether the statute expressly allows the particular item, and whether it appears proper on its face. [Citation.] If so, the burden is on the objecting party to show them to be unnecessary or unreasonable. [Citation.]" (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 131 [84 Cal.Rptr.2d 753] (*Nelson*).)

### a. *Photocopies of the Department's exhibits not used at trial.*

The trial court awarded the Department $1,943.25 for "models, blowups and photocopies of exhibits." Benach insists the award was in error because

---

[12] We need not resolve Benach's arguments regarding the Department's breach of the implied covenant of good faith and fair dealing. Benach's failure to prevail on the contract claim also dooms this claim.

Breach of a specific contractual provision is not a prerequisite to asserting this cause of action. (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373 [6 Cal.Rptr.2d 467, 826 P.2d 710].) However, "[i]t is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. [Citations.] . . . [U]nder traditional contract principles, the implied covenant of good faith is read into contracts 'in order to protect the express covenants or promises of the contract . . . .' [Citation.]" (*Ibid.*) " 'In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.' " (*Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1031–1032 [14 Cal.Rptr.2d 335].) "The covenant thus cannot ' "be endowed with an existence independent of its contractual underpinnings." ' [Citations.] It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 349–350 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

(1) most of the exhibits were not used at trial, and thus were not helpful to the court, and (2) the Department failed to prove that its actual cost of photocopying (as opposed to the amount billed to the client) was 15 cents per page, or that the cost was reasonable.

In *Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774 [23 Cal.Rptr.2d 810] (*Ladas*), on which Benach primarily relies, the court held: "If the items appearing in a cost bill appear to be proper charges, the burden is on the party seeking to tax costs to show that they were not reasonable or necessary. On the other hand, if the items are properly objected to, they are put in issue and the burden of proof is on the party claiming them as costs. [Citations.]" Benach interprets this language to mean his objection automatically shifted the burden to the Department to demonstrate its costs were reasonable and necessary. His reading of *Ladas* is incorrect.

The objecting party made a similar mistake in *Nelson.* Our colleagues in Division Seven clarified the standard: "the mere filing of a motion to tax costs may be a 'proper objection' to an item, the necessity of which appears doubtful, or which does not appear to be proper on its face. [Citation.] However, '[i]f the items appear to be proper charges the verified memorandum is prima facie evidence that the costs, expenses and services therein listed were necessarily incurred by the defendant [citations], and the burden of showing that an item is not properly chargeable or is unreasonable is upon the [objecting party].' [Citations.]" (*Nelson, supra,* 72 Cal.App.4th at p. 131.)

■ The authority for an award of the photocopying and exhibit costs is Code of Civil Procedure section 1033.5, subdivision (c)(4).[13] The Department's counsel presented her declaration stating the parties specifically agreed to and completed a mutual exchange of exhibits in advance of trial, and prepared exhibit binders for use by the court, witnesses and Benach. Although the Department did not use the majority of its exhibits at trial, nothing indicates it could have anticipated that they would not be used. An experienced trial judge would recognize that it would be inequitable to deny as allowable costs exhibits any prudent counsel would prepare in advance of trial.

Moreover, Benach has not made a specific showing that the 15-cent cost per page was excessive.[14] Benach's ability to obtain photocopies for six cents per page at a large retail establishment, which has multiple branches and certainly does a significant volume of retail photocopying business, is not

---

[13] All remaining statutory references are to this code.

[14] The Department concedes its cost bill contains erroneous charges of $49.50 for copying its closing trial brief, and $842.55 for trial documents. On remand the judgment must be adjusted to account for these mistakes.

dispositive of the propriety of the costs paid by the Department for copying exhibits in preparation for trial. Benach has not shown that his circumstances as an individual shopping at such an establishment are analogous to those of a large law firm performing photocopying tasks in-house. Given the law firm's equipment, overhead and personnel expenses, the trial court could certainly conclude the 15-cent·fee was reasonable. The firm's billing statements are adequate documentation of the photocopying costs. The Department established its initial burden by properly stating this item in the verified cost bill. (See *County of Kern v. Ginn* (1983) 146 Cal.App.3d 1107, 1113–1114 [194 Cal.Rptr. 512]; *Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1267 [74 Cal.Rptr.2d 607].) Under the circumstances, we cannot find that Benach has met his burden of demonstrating the particular exhibits were unnecessary or unreasonable in cost, or that the court abused its discretion in allowing the costs to be charged to him under section 1033.5, subdivision (c)(4). (See *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479 [243 Cal.Rptr. 902, 749 P.2d 339] ["When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court"].)

### b. *Messenger service fees.*

Benach challenges the trial court's award to the Department of $2,821.98 for messenger service fees.

■ "Messenger fees are not expressly authorized by statute, but may be allowed in the discretion of the court. [Citations.]" (*Nelson, supra,* 72 Cal.App.4th at p. 132.) Generally, items of cost consigned to the court's discretion are allowable only if they are "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation." (§ 1033.5, subd. (c)(2).) In *Ladas,* an award of messenger fees was upheld because sufficient evidence indicated they "were related to trial preparation, and were incurred for such matters as filing documents with the court, complying with appellants' document demands, and transporting exhibits to and from the courtroom." (*Ladas, supra,* 19 Cal.App.4th at p. 776.)

The Department's counsel submitted evidence that its messenger fees were incurred for court filings and obtaining return service of conformed copies and various court documents. Benach contends these expenses were not authorized by statute and were merely convenient or beneficial expenses that were neither reasonable nor reasonably necessary, and could have been avoided by using less costly alternatives such as filing documents earlier and use of the postal service. He also insists the messenger costs may not be recovered because the Department failed to delineate which costs were for service of process, or who served process.

We are persuaded the costs incurred by the Department for messengering documents were reasonably incurred. Messenger fees may be allowed in the discretion of the court. (*Nelson, supra*, 72 Cal.App.4th at p. 132; *Ladas, supra*, 19 Cal.App.4th at p. 776.) Generally speaking, cost items consigned to the trial court's discretion are allowable only if they are "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation." (§ 1033.5, subd. (c)(2).) The Department's counsel's declaration constitutes substantial evidence that the messenger services were necessary because the complexity of legal issues involved in this action, sheer volume of motions and pleadings filed and served, and the heavy workload maintained by the two attorneys assigned to the case which often prevented them from filing documents in advance of court deadlines. The trial court found the fees were reasonable and reasonably necessary to the Department's conduct of its defense of this litigation, rather than merely beneficial or convenient to its preparation. Benach has provided no basis for concluding that determination was an abuse of judicial discretion.

### c.   *Court reporter fees.*

Benach finally challenges the trial court's award of a discrepancy of $135 in court reporter fees to the Department. He insists he paid $3,930 for court reporter fees, which should be equal to the costs incurred by the Department.

As prevailing party, the Department was statutorily entitled to recover court reporter fees. (§§ 1032, subd. (b), 1033.5, subd. (a)(11); see *Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1298 [87 Cal.Rptr.2d 497].) To that end, the declaration by the Department's attorney was accompanied by attachments reflecting the amount of costs incurred for court-ordered transcripts. This evidence was adequate to substantiate the Department's cost bill. (See *Jones v. Dumrichob, supra*, 63 Cal.App.4th at pp. 1267–1268 & fn. 5 [burden of proving costs satisfied by counsel's declaration accompanied by documentation of items claimed and copies of bills; court rule does not specify type of documentation required and abbreviated nature of cost proceedings does not impose extensive evidentiary burden].) If the items in a cost memorandum appear proper, the verified memorandum is prima facie evidence the expenses were necessarily incurred by the defendant. The burden of showing an item is not properly chargeable or is unreasonable falls on the objector. (*Nelson, supra*, 72 Cal.App.4th at p. 131.) Benach's unsubstantiated declaration fails to satisfy this burden. The trial court did not err in awarding court reporter fees.

## DISPOSITION

The judgment in case No. B189151 is affirmed, and costs are awarded to respondents in that action. The judgment in case No. B191036 is reversed and the matter remanded to the trial court with instructions to vacate its order denying Benach's motion to tax costs as to item No. 11 of respondents' cost memorandum and to enter a new order reducing the amount of costs awarded respondents in item No. 11 by $892.05 ($842.55 + $49.50). In all other respects the judgment in case No. B191036 is affirmed, and each party is to bear his or its own costs of appeal in that matter.

Cooper, P. J., and Rubin, J., concurred.

A petition for a rehearing was denied April 4, 2007, and appellant's petition for review by the Supreme Court was denied July 11, 2007, S153077.