Filed 6/7/16  In re Madyson C. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re MADYSON C., a Person Coming Under the Juvenile Court Law. | B268340<br>(Los Angeles County<br>Super. Ct. No. DK12283) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JESSE C.,<br><br>Defendant and Appellant. | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br><br>**[NO CHANGE IN JUDGMENT]** |

THE COURT:[*]

It is ordered that the opinion filed herein on May 24, 2016, be modified as follows:

On page 10, the first full paragraph, beginning "While father asserts" is deleted and the following paragraph is inserted in its place:

It follows that we reject father's objection to the juvenile court's order requiring him "to undergo mental health counseling, a psychiatric evaluation, take all prescribed psychotropic medications, and complete a 52-week certified BIP

---

[*]    BOREN, P. J., ASHMANN-GERST, J., CHAVEZ, J.

domestic violence program." For the reasons set forth above, the juvenile court acted well within its discretion in making these orders for father.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

Filed 5/24/16  In re Madyson C. CA2/2 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re MADYSON C., a Person Coming Under the Juvenile Court Law. | B268340 (Los Angeles County Super. Ct. No. DK12283) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JESSE C., Defendant and Appellant. | |

APPEAL from findings and an order of the Superior Court of Los Angeles County.  Annabelle G. Cortez, Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Assistant County Counsel, and Erica Edelman-Benadon, Deputy County Counsel, for Plaintiff and Respondent.

_____

Jesse C. (father) appeals from juvenile court jurisdictional findings and the juvenile court's order of monitored visits with his daughter, Madyson C. (Madyson, born June 2011). (Welf. & Inst. Code, §§ 300, 361.)[1]

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Initial Investigation*

On July 14, 2015, the Department of Children and Family Services (DCFS) received a referral regarding Madyson, alleging that she was the victim of emotional abuse and neglect by her parents. Law enforcement went to the house and reported that father answered the door and was sweating profusely. Police officers entered the home and noticed that Jessica C. (mother) had a black eye. Mother reported that father had punched her in the face the week before. She reported that the domestic violence had started recently. She and father lived with their respective parents due to a recent separation. Mother and Madyson continued to spend time with father at his parents' home on the weekends.

Mother and father were both arrested; they were both later convicted of violating Penal Code section 273a, subdivision (b). Madyson was taken into protective custody and was later released to her maternal grandmother.

The emergency social worker interviewed the investigating police officers. They reported that they had found a methamphetamine pipe and butane container on the parents' bathroom counter in plain view and accessible to Madyson. There was marijuana on the kitchen table within Madyson's reach. There was also a distinct odor associated with methamphetamine in the home.

Mother admitted using methamphetamine that evening. She also disclosed to law enforcement that father had smoked methamphetamine in their bathroom 20 minutes

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

prior to the arrival of law enforcement.  The police officers noted that Madyson's toys were in the bathroom sink where father had reportedly just smoked methamphetamine.

The police officers observed rashes on both parents.  They also noticed that Madyson was scratching herself and determined that she had been exposed to methamphetamine fumes.

The social worker then spoke to mother.  Mother was tearful and emotional during the interview and repeatedly stated, "'I'm so sorry, I made a terrible mistake.'"  Mother revealed that there had been prior domestic violence incidents with father.  Father had previously pushed and grabbed her.  Mother reported that she had started smoking methamphetamine with father about three weeks before the July 14, 2015, incident.

Next the social worker attempted to speak to father, but he did not participate in the interview.  According to the social worker, he kept falling asleep and did not answer most of the questions.  Father admitted to using methamphetamine but did not respond to questions regarding the length and frequency of his drug abuse.  He did not admit to domestic violence; he repeatedly indicated that "'things just got out of control.  It just escalated.'"

Then the social worker spoke to Madyson.  She told the social worker that she felt safe with mother and her grandparents, but not with father.  She told the social worker that "'[h]e is scary sometimes.'"  She also said that he is "'[n]ice' sometimes."

Later the social worker interviewed Madyson's maternal grandmother.  She had recently become concerned for mother's well-being.  She noticed bruises and rashes on mother's arms; also, mother looked gaunt and had lost weight.  The maternal grandmother reported that mother had told her that she had started to use drugs with father.  She also recently revealed that she was a victim of domestic violence.  According to the maternal grandmother, when mother told father that she was going to leave him, father threw her belongings into the hallway of their apartment, placed a knife at his throat, and threatened to kill himself; Madyson was present.  The maternal grandmother further stated that Madyson's teacher had reported that Madyson had "rehashed the incidents at school."

Last, the emergency social worker interviewed the paternal grandfather. He recalled an incident when father had vandalized his car after having a heated argument with mother, who had been using her father's car. Father repaired the car the following day and apologized.

*Section 300 Petition and Detention Hearing*

On July 17, 2015, DCFS filed a section 300 petition on behalf of Madyson. Under section 300, subdivision (a), the petition alleges that father and mother "have a history of engaging in violent altercations in the child's presence. On a prior occasion, in July of 2015, the father struck the mother's face inflicting bruises to the mother's eye. On a prior occasion, the father pushed and grabbed the mother. The mother [is] unable to protect the child in that the mother allowed the father to have unlimited access to the child. On 07/14/2015, the father was arrested for Felony Spousal Abuse. Due to the violent conduct on the part of the father against the mother the child is afraid. The violent conduct on the part of the father endanger[s] the child's physical health and safety and place[s] the child at risk of serious physical harm, damage and failure to protect." The petition further alleges, under subdivision (b), that mother and father placed Madyson in a detrimental and endangering situation as a result of their illicit drug use and the fact that drugs and drug paraphernalia were found within Madyson's access in the house. Also under subdivision (b), the petition alleges domestic violence. Last, again under subdivision (b), the petition alleges that father has exhibited behavior consistent with mental and emotional problems, including suicidal ideation, which renders him incapable of providing Madyson with regular care and supervision.

At the July 17, 2015, hearing, the juvenile court made prima facie findings to detain Madyson from her parents. She was placed with her maternal grandmother.

*Jurisdiction/Disposition Report*

The juvenile court received the jurisdiction/disposition report on October 14, 2015. Madyson remained in her maternal grandparents' care.

Madyson informed the social worker that mother and father "'smoked outside'" and that it "'smelled funny.'" She also said that father smoked at his house.

4

Madyson also reported that she had seen father hit mother. She also saw father with a knife and saw him point the knife to his stomach.

The investigator then spoke with mother. She reported that father only smoked methamphetamine and marijuana outside their apartment on the balcony and never in front of Madyson. She indicated that she had started smoking methamphetamine about two months ago. According to mother, she and father only smoked on the weekends. But father had been smoking over the past two years.

Mother also reported that father had hit her on the face on her way to work on July 6, 2015, when she and Madyson were passengers in the car. She stated that father grabbed her on July 14, 2015, the night the police were called to their home. He also grabbed a knife and put it up to his neck and stomach. She said that he did that because she was going to leave him. She also recounted a separate incident when father struck her with an open palm, causing her to fall on to their bed. That incident resulted in a bruise underneath her left eye.

The investigator spoke to father by telephone. He said that he and mother had been using methamphetamine for the past year or two, mainly on the weekends or every other weekend. He said that the marijuana was on the balcony and the methamphetamine was in a drawer in his bedroom. He denied that he used the methamphetamine in front of Madyson, claiming that he used on the balcony when Madyson was not there or when she went to bed.

When asked about domestic violence, father indicated that it began in May 2015. He recalled them getting into "'heavy arguments,'" but he could only remember hitting mother on the arm one time. He said that he tried to walk away from mother when they argued.

Father stated that on July 14, 2015, he had put a knife to his stomach and neck. He claimed that he did not want to die but that he only wanted to stop mother from leaving him. He was upset with mother and they had argued that evening. He denied a history of mental illness or suicidal ideation. While he had previously been diagnosed with anxiety, he did not recall the name of his antianxiety medication.

5

The maternal grandmother remembered seeing bruising on mother's arm. She had never seen mother and father use drugs and did not know that they had been using.

The maternal grandfather reported that mother had shown him a picture on her cell phone of father with a knife and there was blood on his arm where he had cut himself. He also had noticed bruises on mother's arms; mother had started to wear long sleeve shirts. Like the maternal grandmother, he did not know that mother and father had been using drugs. He denied ever seeing father use drugs. But he did recall an incident when father was sweating a lot and his "'eyes were real big.'"

Attached to the report were the Glendale Police Department reports, detailing what had occurred on July 14, 2015. These reports reiterated that Madyson had told the police that her parents were arguing and that father was going to kill himself. She also told police officers that the parents had been hitting each other and that she was scared.

The police reports revealed that police officers had located drugs and drug paraphernalia in the home.

Attached to the report was a September 18, 2015, letter from Dr. Edith H. Hartoonian, director of the Glendale Counseling Center. According to Dr. Hartoonian, father's whereabouts were unknown. He had stopped attending the mandated 52-week domestic violence batterers' intervention group counseling and parenting skills education group counseling programs.

*Adjudication/Disposition Hearing*

At the hearing, Madyson's attorney asked the juvenile court to sustain the section 300 petition. Father's attorney submitted with the exception of count (b)(5), arguing that DCFS had not met its burden with respect to mental health.

Mother's counsel then asked for Madyson's return to her custody. DCFS and Madyson's attorney asked that Madyson be suitably placed. The juvenile court declared Madyson a dependent of the court, removed her from her parents' custody, and ordered her suitably placed. The parents were granted reunification services, including monitored visits for father, with DCFS discretion to liberalize. Father was ordered to participate in a full drug/alcohol program with aftercare, random and on-demand drug/alcohol testing

6

every other week, as well as a 52-week domestic violence counseling program for perpetrators, parenting education, and individual counseling.  Father was also ordered to have a psychiatric evaluation and take all prescribed psychotropic medication.  Father was further ordered to comply with all criminal court orders.

*Appeal*

Father's timely appeal ensued.

## DISCUSSION

Father challenges the juvenile court's jurisdictional findings and dispositional order against him.[2]

I.  *Jurisdiction*

We apply the substantial evidence standard of review.  (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393; *In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) Jurisdiction is appropriate under section 300, subdivision (b), where there is substantial evidence that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child."  Three elements must exist for a jurisdictional finding under section 300, subdivision (b):  (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "'serious physical harm or illness'" to the child, or a "'substantial risk'" of such harm or illness. (*In re J.O.* (2009) 178 Cal.App.4th 139, 152.)

While section 300 generally requires that a child be subject to a "defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is abused or injured to assume jurisdiction and take steps necessary to protect the child.  [Citation.]"  (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215–1216.)

---

[2]  DCFS argues that because father does not challenge the entire section 300 petition, we need not address father's jurisdictional arguments.  (See, e.g., *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397 [dependency jurisdiction may be based on the actions of one parent alone]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1491–1492.)  We exercise our discretion to review the merits of father's arguments.

We may affirm the juvenile court's orders made at the jurisdictional stage if substantial evidence supports any one of the counts. (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875–877; *In re Dirk S.* (1993) 14 Cal.App.4th 1037, 1045.)

We conclude that the juvenile court correctly found that Madyson was a person described by section 300 as a result of domestic violence and father's mental health.

First, there is ample evidence of domestic violence between mother and father. After DCFS and law enforcement began investigating allegations of abuse and neglect, mother disclosed that father had previously pushed, hit, grabbed, and punched her. The maternal grandparents observed bruises on mother and noticed her attempt to hide them by wearing long sleeve shirts.

Father's violence towards mother had recently escalated. For example, on July 6, 2015, father punched mother in the face with his fist while he was driving the car; Madyson was present at the time and witnessed the assault. While father asserts that there was no evidence that Madyson was present (and mother claimed that Madyson was sleeping), Madyson was able to recount the incident to the dependency investigator. Also, on July 14, 2015, the parents were involved in a violent altercation. Madyson saw father hit mother that evening, and Madyson was scared.

Exposure to domestic violence may serve as the basis of a jurisdictional finding under section 300, subdivision (b), as children can be put at substantial risk of harm. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194; *In re R.C.* (2012) 210 Cal.App.4th 930, 941; *In re T.V.* (2013) 217 Cal.App.4th 126, 134; *In re Sylvia R.* (1997) 55 Cal.App.4th 559, 562.) Based upon the evidence presented here, the juvenile court had more than sufficient evidence of domestic violence to sustain the allegations under subdivisions (a) and (b) in the section 300 petition. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 600–601.)

Second, there is ample evidence to support the juvenile court's finding that father's mental and emotional condition endangered Madyson. Father has a documented pattern of extreme volatility and explosive behavior towards mother in Madyson's

8

presence. Although he denies a history of mental illness, he had been diagnosed with anxiety. But, there is no evidence that he sought treatment for his affliction.

And, while father claims he does not suffer from suicidal ideation, there was evidence of at least one incident in which father grabbed a knife and held it to his neck and stomach and told mother and Madyson that he was going to kill himself. Madyson witnessed father's suicide attempt and, not surprisingly, she was scared. Moreover, there was evidence from the maternal grandfather that mother had shown him a picture of father with a knife and blood on his arm from where he had cut himself. Under these circumstances, we conclude that there was sufficient evidence to sustain count b-5 of the section 300 petition.

Father's reliance upon *In re A.G.* (2013) 220 Cal.App.4th 675 is misplaced. In that case, the children's mother was mentally ill and unable to provide regular care for her children as a result. But, their father had always been capable of properly caring for them. (*Id*. at p. 686.) In contrast, in this case and at this point in the proceedings, both parents have been deemed incapable of caring for Madyson.

Similarly, *In re David M.* (2005) 134 Cal.App.4th 822 does not aid father on appeal. In that case, there was no indication that the parents' mental illness impacted their ability to care for their child. (*Id*. at p. 827.) Such evidence is a far cry from father here, who threatened to kill himself with a knife on at least one occasion in front of Madyson.

II. *Disposition*

Father objects to the juvenile court's order granting father monitored visitation. We review the juvenile court's order for abuse of discretion. (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.)

Father argues that there was no evidence to support an order requiring a monitor for father's visits. We cannot agree. For the reasons set forth above, the juvenile court's order for monitored visitation is supported by sufficient evidence. Father has a history of drug abuse. He has unresolved mental health issues and violent tendencies. He has been violent towards mother. And he has not attempted to resolve the issues that brought this

9

family to the attention of DCFS and the juvenile court; instead of participating in mental health services or domestic violence classes, he continues to be in denial of these issues.

While father asserts in one sentence in the conclusion portion of his opening brief, that the order requiring him "to undergo mental health counseling, a psychiatric evaluation, take all prescribed psychotropic medications, and complete a 52-week certified BIP domestic violence program" should be reversed, this contention is not otherwise challenged in his opening brief; as such, this request is inadequate. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

## DISPOSITION

The juvenile court's findings and order are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
                ASHMANN-GERST


We concur:


_____, P. J.
     BOREN


_____, J.
     CHAVEZ