Filed 9/26/22  In re T.S. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re T.S., a Person Coming Under the Juvenile Court Law. | B312520 (Los Angeles County Super. Ct. No. 21CCJP01067A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. E.S., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Robin R. Kesler, Judge Pro Tempore.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, E.S. (mother) challenges the juvenile court's jurisdictional findings and dispositional orders as to her then-15-year-old daughter T.S. (daughter). Mother argues the juvenile court erred when it exercised jurisdiction over daughter and removed her from mother's custody and care. Additionally, mother claims the juvenile court abused its discretion in ordering monitored visitation in particular and her reunification case plan in general. We conclude mother forfeited her challenges to jurisdiction, removal, and the reunification case plan. As to her challenge to monitored visitation, we disagree.

Mother also challenges the juvenile court's finding that the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California law did not apply. Although the juvenile court may have committed error under ICWA and related California law, that noncompliance was harmless because there is no " 'reason to believe' " that the inquiry mother identifies would lead to a different result. (See *In re Dezi C.* (2022) 79 Cal.App.5th 769, 779, review granted Sept. 21, 2022, S275578.)

## BACKGROUND

### 1.    The Family

Mother has four children.  Daughter is her second oldest child.  Her other three children live with her, are not involved with these dependency proceedings, and were found to be safe in her care.  Daughter's father is not a party to this appeal but was involved in the proceedings below.

### 2.    Previous Referrals

In June 2020, prior to the instant proceedings, a referral was made to the Los Angeles County Department of Children and Family Services (Department), alleging mother had physically abused daughter with a broom, a belt, and a skillet.  Daughter reported that a mark on her arm was the result of mother hitting her with a broom.  At the time, daughter had been living with mother but, after the referral, daughter lived with father.  The referral was closed in part as inconclusive and in part as unfounded.  In addition, there were two other earlier referrals regarding the family that were concluded as unfounded and inconclusive.

### 3.    Events Preceding Petition

In early February 2021, the Department received a referral stating paternal grandparents had kicked daughter out of their home and no longer wanted to care for her.  The referral also stated paternal grandparents had not taken care of daughter and had fed her only noodles, and that neither parent wanted to care for daughter.

As a result of the referral, a Department social worker spoke with daughter and family members.  Daughter told the social worker the allegations of the referral were true.  She said paternal grandparents mistreated her, fed her only noodles,

3

would not let her open the refrigerator without asking, and kicked her out of their home. Daughter said father "bought his other children a lot of stuff for Christmas and not for her." According to daughter, when she lived with mother, she had everything but when she lived with father "everything went down." Daughter also said her paternal aunt and paternal grandmother hit her. The social worker reported daughter smirked during her interview and "seemed proud, happy and appeared to laugh" as she shared a video of her smoking marijuana with someone else, whom daughter identified as mother. The Department social worker later noted, however, she could not tell if the person with daughter was mother. Daughter told the social worker she began running away from paternal grandparents' home in December 2020 and would stay on and off with Ms. M. Garrett.

On the other hand, father told the social worker the paternal grandparents had not thrown daughter out of the house. He expressed frustration with daughter's desire to do whatever she wanted and her proclivity to run away whenever she did not get what she wanted. He noted last Christmas daughter had asked for something he could not afford. When daughter discovered he had not bought what she asked for, "she cursed him out and stopped talking to him." Father stated mother kept daughter from him as a child and now she was a teenager who did not listen. He felt he could not discipline her. He explained when daughter first came to live with him the year before, he did not believe mother's side of the story. Since then, however, father came to believe daughter made up the allegations against mother because she did not want to follow rules. Father said he had been taking daughter to therapy but she had missed her last few

4

appointments because she had left home.  Father explained he had other children, a job, and a criminal history.  He did not want to risk daughter making false accusations against him that could send him to jail.  Father did not care if mother wanted to take daughter back home.

Mother told the social worker the woman with whom daughter had been staying, Ms. Garrett, was the foster parent for mother's younger sister, daughter's maternal aunt (maternal aunt).  Mother said maternal aunt was not a good influence for daughter and believed maternal aunt may have influenced daughter to want to be in foster care.  However, mother did not want daughter "in the system" and asked what she could do to have the referral closed.  The social worker explained mother and father needed to bring daughter home or make an appropriate plan with relatives.  Although mother was skeptical—stating daughter would not want to be with mother but instead wanted to be "running the streets" and "doing whatever she wants"— mother called daughter with the social worker to tell her she had to return to paternal grandparents' home or come home with mother.  Daughter responded by yelling and threatening to " 'burn the house; that it was going to be hell or that she was going to jail for murder.' "

Mother explained the year before daughter falsely accused mother of beating her up and trying to stab her.  As a result and since then, daughter lived with father.  Mother noted when daughter calls her now, mother has someone with her to witness the conversation because mother does not want daughter making further allegations against her. Mother stated daughter had called just before mother's interview with the social worker.  In that call daughter told mother paternal grandparents mistreated

her and paternal aunt and paternal grandmother had hit her. Mother indicated she did not know if daughter was being honest, stating daughter had "lied about her in the past" and mother "does not know what to believe anymore." Although mother did not know what was happening at paternal grandparents' home, she did not believe they would kick daughter out of the house. Mother indicated daughter could return to live with her but mother did not believe daughter would want to because mother did not allow daughter "to be running the streets."

Paternal grandparents and paternal aunt reiterated what mother and father had said about daughter. Daughter did not like rules, wanted to do whatever she desired, had expensive tastes, and if she did not get what she wanted, would become very upset. They denied daughter was kicked out of paternal grandparents' home and indicated she could return anytime. They explained daughter began leaving the home in approximately January 2021 and they discovered she had been staying with maternal aunt in her foster home. They worried for daughter's safety.

The social worker also spoke with daughter's three brothers. Her brothers did not believe paternal grandparents kicked daughter out of their home or that they mistreated her. Rather, they believed daughter lied, and one of her brothers stated she "always causes problems." They believed maternal aunt also lied a lot and was a bad influence on daughter. Daughter's brothers indicated mother always provided for them and took care of them, including daughter. Daughter's youngest brother denied mother hit any of her children. The Department expressed no concerns for the children's safety in mother's care.

6

The social worker also spoke with Ms. Garrett, maternal aunt's foster mother and with whom daughter had been staying. Ms. Garrett reported daughter had said she was mistreated and abused by paternal grandparents. Ms. Garrett stated mother and father knew daughter was mistreated by paternal grandparents but did not care. Ms. Garrett said daughter had bonded with her and her family and was welcome to stay with them.

Finally, the social worker spoke with mother's boyfriend of the past seven months. He stated he did not know daughter well but reported she called mother to ask for money or to curse at her and threaten to beat her up. He said mother worked hard and provided for and took good care of her children. He noted despite daughter's poor treatment of mother, mother was always willing to take money or food to daughter when she could.

In mid-February 2021, a Department social worker recommended mother or father pick up daughter from Ms. Garrett's home. Mother agreed to do so, but believed daughter would not want to leave with her. The social worker advised mother to call law enforcement if needed. The social worker alerted Ms. Garrett of the plan, who then told daughter. Daughter became upset and threatened to run away. Before trying to pick up daughter, mother spoke with both daughter and the social worker on the phone to discuss the plan. However, daughter again became very upset, saying she preferred to be on the streets than with mother or father because "they put their hands on her." Daughter again threatened to beat up mother. Mother stayed in contact with daughter for days, trying to convince her to return home, but daughter refused. Mother also communicated with the Department social worker, giving

updates on her attempts to bring daughter home and indicating she did not want daughter in the foster system or "jumping around from placement to placement." Mother and the social worker discussed possible placement options. Mother appeared amenable to daughter being placed with Ms. Garrett. The social worker reported daughter often was irritated with mother, cried, yelled, claimed she would " 'end up in jail for killing someone or run away,' " and threatened to " 'fuck the mother up.' "

## 4. Consent to Jurisdiction and Removal

On March 4, 2021, mother and father provided verbal and written consent granting the Department jurisdiction over daughter and permitting the removal of daughter from their care. Mother believed she had "tried everything and she no longer knows what to do with [daughter], as she is refusing to go with her, the father or anyone else that is not Ms. Garrett." Mother hoped to reunify with daughter in the near future. The Department reported not only did mother and father feel they no longer were able to meet daughter's needs, but daughter refused all of mother's suggestions and was adamant she wanted to be in foster care with Ms. Garrett.

Thus, with mother and father's consent, the Department removed daughter from parents' custody and placed her with Ms. Garrett.

## 5. Petition and Detention

Soon after, on March 8, 2021, the Department filed a Welfare and Institutions Code section 300 petition on behalf of daughter (petition).[1] The petition alleged two counts, both of which stated daughter had ongoing behavior issues, including

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

"chronic runaway episodes and aggressive and threatening behaviors." Count b-1 stated father was unable to supervise and care for daughter and had consented to daughter being placed in protective custody. Count b-2 stated mother was unable to supervise and care for daughter and had consented to daughter being placed in protective custody.

At the detention hearing held a few days later, the juvenile court ordered daughter removed from her parents' custody and care and detained in shelter care under Department supervision. The court ordered monitored visitation for mother and father.

**6.    Continued Investigation**

In April 2021, a Department social worker conducted further interviews of the family. Daughter reported she was happy in Ms. Garrett's care. Daughter told the social worker mother had stabbed her in her stomach and hit her with various items. Daughter stated mother drank a lot, used to drive while drinking, and became aggressive when she drank. Daughter claimed mother picked on her and "put her hands on me" when she fought with her boyfriend. Daughter also accused mother of committing fraud. As to father, daughter stated he had never been a part of her life, had "kids everywhere," and did not prioritize her. Daughter also accused both paternal aunt and father's girlfriend of hitting her. Daughter told the social worker paternal grandparents did not let her leave the home and only allowed her to eat noodles. Daughter denied running away from paternal grandparents' home. She stated they "kicked me out for no reason." Daughter said, "I can't picture myself ever living with my parents." She did not want to reunify with her parents but wanted to stay in Ms. Garrett's care.

Mother told the social worker daughter was a compulsive liar and materialistic.  Mother stated after daughter falsely accused mother of hitting her, daughter lived with father.  Once father understood daughter had serious behavior issues, he moved daughter in with paternal grandparents.  Mother did not believe father was a danger to daughter but believed father could not " 'handle her bad attitude.' "  Mother expressed concern that daughter's lies could have resulted in her other children being " 'taken away.' "  Mother revealed she had been sexually molested by a trusted family member when she was younger and, as a result, mother thought she might be "over protective" of daughter.  Due to daughter's threats against her, mother stated she suffered from anxiety, expressed feelings of anger toward daughter, and did not want to visit with daughter "until deemed appropriate."  Mother also noted her oldest son, who had been shot eight times and was seriously injured, was affiliated with a street gang and " 'on borrowed time.' "  She said when he was shot, she stayed with him at the hospital for 21 days, and lost her job, home, and car.  Mother worried constantly about her oldest son.

The social worker noted that during her interview mother "suck[ed] her thumb as a coping mechanism" and there were "patches of bald spots" on the right side of her head.  Mother explained she suffered high levels of anxiety due to daughter's accusations of physical abuse and violent threats, causing mother to pull her hair out.  Nonetheless, the social worker noted mother was appropriate, engaged, and did not appear to be under the influence of any substances during the interview.  The social worker also spoke with mother's therapist, who noted "mother'[s] behaviors and symptoms have improved since being off he[r]

medication. . . . [She] is less agitated, aggressive, and more motivated." He had no concerns for mother. Mother explained on the advice of her therapist, she stopped taking her prescribed anxiety medication, after which her anxiety levels dropped. She denied using illicit drugs or marijuana or abusing alcohol.

Father told the social worker he wanted to waive reunification services and did not want daughter returned to his custody. He stated daughter did not listen to him, lied about family members hitting her, left the house without permission, refused to eat food paternal grandparents made for her, threatened paternal grandparents, and got angry if others did not buy her expensive things. Father did not believe mother hit daughter. Father said, "I don't care for any visits. Once she reaches of age, she can look for me. I'm not trying to get in trouble. I have a four-year-old that needs me."

The social worker also spoke with daughter's three siblings and paternal grandparents, all of whom reiterated what they and others had already reported. For example, they noted daughter had behavior issues that included compulsive lying, running away, and threatening harm to others, especially when she did not get her way. Daughter's brothers denied any abuse or neglect in their home with mother.

Ms. Garrett told the social worker she had not seen daughter display any problematic behaviors. Ms. Garrett stated she was supporting daughter in her goal of becoming a registered nurse. Ms. Garrett believed mother was not pleased with daughter's progress while in Ms. Garrett's care.

Finally, also in April 2021, the Department social worker spoke with a mental health provider for daughter, who reported daughter had made homicidal threats against mother and the

Department.  Daughter said she made such threats so she would be "taken 'serious.' "  The mental health provider said daughter participated actively in intensive services and was motivated and goal oriented.

Due to allegations of general neglect, mother and father's contentious relationship, daughter's defiant behaviors, mother and father's inability to manage those behaviors, mother's and father's childhood trauma, emotional abuse, and daughter's homicidal ideations toward mother, the Department concluded daughter was at high risk for future neglect and recommended she be declared a dependent of the court.

**7.    Amended Petition**

On April 27, 2021, nine days before the jurisdiction and disposition hearing, the Department filed a first amended petition (amended petition).  In addition to the two original subdivision (b) counts (alleging mother and father were unable to supervise and care for daughter and had consented to daughter being placed in protective custody), the amended petition also alleged eight new counts.  Three new subdivision (a) counts alleged mother, father, and father's significant other physically abused daughter.  Five new subdivision (b) counts repeated the physical abuse allegations as well as alleged mother suffered from mental and emotional problems, had a history of substance abuse, and was a current abuser of alcohol and marijuana.  After the amended petition was filed, the juvenile court dismissed the original petition.

**8.    Adjudication and Disposition**

The juvenile court held the adjudication and disposition hearing on May 6, 2021.

At the hearing, counsel for mother entered a general denial as to the amended petition on behalf of mother. Counsel stated, "My client is asking the court to dismiss all the counts on this [amended] petition." Mother's counsel argued there was insufficient evidence to support either of the counts related to alleged physical abuse, the count related to mother's alleged mental health issues, or the count related to mother's alleged substance abuse. Counsel submitted count b-2 (related to mother's inability to supervise and care for daughter and her consent to daughter being placed in protective custody) to the court stating, "This was the only count pled in the original petition, and this is the only count that this court can possibly sustain today." As to disposition, counsel for mother stated mother submitted to an order of suitable placement but objected to drug testing and a mental health assessment.

Counsel for father noted the general consensus that daughter was not trustworthy. Nonetheless, similar to mother's counsel, counsel for father stated count b-1 (related to father's inability to supervise and care for daughter and his consent to daughter being placed in protective custody) "is true" and submitted on that count.

Counsel for the Department argued the juvenile court should sustain the amended petition except for the counts related to father's alleged physical abuse of daughter. Counsel for the Department expressed concern that the family situation was "chaotic" and mother and father had admitted "they are not able to provide care for [daughter], they are not able to meet her needs." The Department asked the court to "protect [daughter] so that she can get the services and the support that she needs."

13

After hearing argument from counsel, the juvenile court sustained the two original subdivision (b) counts, counts b-1 and b-2, related to mother's and father's inability to provide daughter proper care and supervision and their consent to protective custody. The court dismissed the remaining counts of the amended petition. The court stated, "I cannot find, necessarily, that the minor's statements are credible, throughout." The court concluded that daughter's "behaviors are beyond these parents' ability to maintain her safely in the home." The court declared daughter a dependent of the court under section 300, subdivision (b), and removed her from her parents' custody and care.

As to disposition, the court ordered mother "to do four random and on-demand consecutive clean drug tests, and then on suspicion after that. And she needs to have very low levels of marijuana." The court noted its drug testing order was "dispositional, but not jurisdictional." The court also ordered mother to take her prescribed medications, to participate in mental health counseling, and to submit to a psychological assessment, stating, "Mother's behaviors in regards to sucking a thumb and pulling her hair out is concerning to this court if she is going to reunify with her child." The court also ordered mother to take parenting classes. Although daughter did not want to visit with either mother or father, the court ordered monitored visitation for both parents.[2] Counsel for mother noted "mother's objection to the case plan."

_____

[2] At the hearing, father waived family reunification services. Thus, the juvenile court did not order services for father.

14

**9.      ICWA**

In February 2021, mother denied having Native American heritage.  In March 2021, father was unsure but thought his grandmother (paternal great grandmother) might have Native American heritage.  Mother and father each filed a "parental notification of Indian status" form (ICWA-020) with the juvenile court.  Mother's form indicated she had no Indian ancestry.  Father's form stated he had "no Indian ancestry as far as I know."

At the March 11, 2021, detention hearing, the juvenile court stated it had no reason to know that ICWA applied as to mother.  However, the court noted "there may be some Unknown tribe Native American/Indian heritage in the father's background."  The court ordered the Department to investigate that claim.

The following month, on April 21, 2021, father told a Department social worker he did not have any Native American ancestry.

At the May 6, 2021 jurisdiction and disposition hearing, father's counsel questioned father regarding his previous equivocal statement regarding potential Native American ancestry.  Father stated he spoke with paternal great grandmother, who "didn't say anybody was [a] registered" member of an Indian tribe.  He said there was "nothing that she can do in order [to] get the full ancestry report.  So I have no way of obtaining that information."  The juvenile court then made "the ultimate finding that the Indian Child Welfare Act does not apply," stating, "I have no reason to believe that it would apply."

15

**10.    Appeal**

Mother appealed the juvenile court's "Dispositional case plan orders made following hearings on 05/06/2021."

## DISCUSSION

**1.    Jurisdiction and Removal**

Mother argues the juvenile court erred when it took jurisdiction over daughter. Mother claims there were no factual or legal grounds for dependency jurisdiction and the juvenile court's jurisdictional findings were arbitrary and unfounded. Mother argues daughter simply was willful, misbehaving, and dictating what she wanted and where she wanted to be. Similarly, mother asserts the juvenile court's removal order was unsupported and an abuse of discretion.[3]

We conclude mother forfeited her challenges to jurisdiction and removal for the simple reasons she consented to both and failed to object below. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 [forfeiture doctrine applies in dependency cases].) In March 2021, mother gave her consent for the Department to remove daughter from her custody and care. According to her written affidavit, mother made this decision based not only on her inability to care for and supervise daughter but also on daughter's threatening behaviors. The petition's one count related to mother (count b-2) addressed these very concerns and noted mother had consented to both daughter's removal and

---

[3] Although in her opening brief mother cites legal authority regarding removal orders, she fails to apply that authority to the specific facts of her case. Thus, her position as to removal (as well as to the court-ordered case plan discussed below) is lacking any true legal analysis or argument for us to consider. (Cal. Rules of Court, rule 8.204(a)(1)(B).)

16

daughter being taken into protective custody. That same count (count b-2) was repeated in the amended petition and was the only sustained count involving mother. All other counts involving mother were dismissed. Indeed, at the jurisdiction hearing, after arguing against the amended petition, counsel for mother conceded count b-2 was "the only count that [the juvenile] court can possibly sustain today" and submitted "the matter of count (b)(2) to the court." Thus, although mother objected to the counts added to the amended petition, she did not object as to the original b-2 count alleged in the petition. Counsel for mother also "submit[ed] to a suitable placement order."

Moreover, beyond mother's consent and failure to object, the factual record amply supports the jurisdictional findings and removal order. (*In re I.J.* (2013) 56 Cal.4th 766, 773 [substantial evidence standard of review applies to juvenile court's jurisdictional findings and removal order]; *In re Nathan E.* (2021) 61 Cal.App.5th 114, 123 [same].) As the Department notes, this is an incorrigible child case. (See *In re R.T.* (2017) 3 Cal.5th 622, 637.) Daughter repeatedly ran away from home, physically threatened mother and others (including homicidal threats), lied compulsively, and despite sincere efforts to care for and supervise daughter, mother was unable to do so. Finally, in her notice of appeal, mother seemed to recognize jurisdiction and removal were appropriate, stating she appealed only the "Dispositional case plan orders made following hearings on 05/06/2021."

Based on the record before us, we conclude the juvenile court's jurisdictional findings and removal order were neither arbitrary nor unfounded. Rather, they were supported not only by mother's consent and failure to object but also substantial evidence.

17

## 2. Visitation and Reunification Case Plan

Mother also argues the court-ordered reunification case plan generally, and its monitored visitation requirement specifically, were unfounded and an abuse of discretion. We review the court's dispositional orders including monitored visitation for an abuse of discretion. (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1070; *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.)

### a. Monitored Visitation

In making a visitation order, the juvenile court balances "the interests of the parent in visitation with the best interests of the child. In balancing these interests, the court in the exercise of its judicial discretion should determine whether there should be any right to visitation." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.) "The court may, of course, impose any other conditions or requirements to further define the right to visitation in light of the particular circumstances of the case before it." (*Ibid.*)

Mother states "there was no risk presented by either parent justifying a need for a monitor" and "[t]here was no evidence that unmonitored visitation would place the minors [*sic*] at risk." As the Department correctly notes, however, mother's position is not supported by the record. Daughter did not want to live with mother and when she spoke with mother she often cursed at and physically threatened her. Although mother appeared to want what was best for daughter, mother had grown apart from daughter and reported "feelings of anger toward" her since she had accused mother of physical abuse. Mother insisted on having a witness with her when she spoke with daughter to protect against false accusations. Based on the record before us, we

18

conclude the juvenile court did not abuse its discretion in ordering monitored visitation for mother.

### b. Reunification Case Plan Generally

"At the dispositional hearing, the juvenile court must order child welfare services for the minor and the minor's parents to facilitate reunification of the family. [Citations.] The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion." (*In re Christopher H.*, *supra*, 50 Cal.App4th at p. 1006.) "The reunification plan ' "must be appropriate for each family and be based on the unique facts relating to that family." ' " (*Ibid.*)

Mother asserts the entire court-ordered case plan "was without substantiation or justification." Mother fails to support this conclusion with either reasoned argument or relevant legal citation. Thus, we consider the argument forfeited. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"]; Cal. Rules of Court, rule 8.204(a)(1)(B).)[4]

### 3. ICWA

Finally, mother argues the Department failed to satisfy its inquiry requirements under ICWA and, therefore, the juvenile court erred because it relied on inadequate information in

---

[4] Mother ends her discussion of the court's disposition orders by claiming voluntary supervision under section 301 would have been less drastic and more than sufficient. However, because we have already affirmed the juvenile court's jurisdictional findings, mother's voluntary supervision argument is unavailing.

determining ICWA did not apply.  Applying our recent decision in *In re Dezi C.*, *supra*, 79 Cal.App.5th 769, review granted, we conclude any error was harmless.

### a.    Applicable Law

"[The] ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family."  (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881; see also 25 U.S.C. § 1902.)  For purposes of ICWA, an " 'Indian child' " is an unmarried individual under age 18 who is either (1) a member of a federally recognized Indian tribe or (2) eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe.  (See 25 U.S.C. § 1903(4) [definition of " 'Indian child' "] & (8) [definition of " 'Indian tribe' "]; see also Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal definitions].)

Under California law, the Department and the juvenile court "have an affirmative and continuing duty to inquire" into whether a dependent child "is or may be an Indian child." (§ 224.2, subd. (a); see also *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741–742.)  " 'Following changes to the federal regulations concerning ICWA compliance, California made conforming amendments to its statutory scheme regarding ICWA, effective in 2019. [Citation.]  . . . [T]he resulting clarification of law, found in part in section 224.2, "creates three distinct duties regarding ICWA in dependency proceedings." ' " (*In re H.V.* (2022) 75 Cal.App.5th 433, 437.)  The first duty—an initial duty of inquiry—is at issue here.

The initial duty of inquiry requires " 'from the [Department]'s initial contact with a minor and his family, . . . a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).)' " (*In re H.V.*, *supra*, 75 Cal.App.5th at p. 437.) This includes the Department "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child" (§ 224.2, subd. (b); see also Cal. Rules of Court, rule 5.481(a)(1)), as well as the juvenile court inquiring at each party's first appearance in the proceedings whether he or she knows or has reason to know that the child is an Indian child (§ 224.2, subd. (c); see also Cal. Rules of Court, rule 5.481(a)(2)). Further inquiry and notice to the tribes (i.e., the second and third ICWA duties) may be required only if there is "reason to believe" or "reason to know" that the child is an Indian child based upon this initial inquiry. (§ 224.2, subds. (d), (e) & (f); 25 C.F.R. § 23.107(c) (2021).) These further inquiry and notice requirements are not at issue here.

### b. Standard of Review

"We review claims of inadequate inquiry into a child's Indian ancestry for substantial evidence." (*In re H.V.*, *supra*, 75 Cal.App.5th at p. 438.) Where the facts are undisputed, we must independently determine whether ICWA's requirements have been satisfied. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051.)

### c. The Department's deficient initial inquiry did not result in prejudicial error.

As mother correctly notes, the Department did not satisfy its initial inquiry obligation because it failed " 'to make a meaningful effort to . . . interview extended family members to

21

obtain whatever information they may have as to the child's possible Indian status.' " (*In re A.C.* (2022) 75 Cal.App.5th 1009, 1015.) Although the Department inquired of mother and father as to daughter's potential status as an Indian child, the Department did not ask the same of extended family members, such as paternal grandparents and paternal aunt, all of whom the Department had contact with during the underlying proceedings. (§ 224.2, subd. (b); see also Cal. Rules of Court, rule 5.481(a)(1).)

In light of the Department's failings in this regard, we must determine whether the juvenile court committed reversible error when, based on insufficient evidence, it held ICWA did not apply. The courts—including those within our Second District— are at odds over whether and when such an error is prejudicial and, therefore, reversible. (*In re A.C.*, *supra*, 75 Cal.App.5th at p. 1011.) Our Division has adopted the following rule: "[A]n agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding. For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*In re Dezi C.*, *supra*, 79 Cal.App.5th at p. 779, rev.gr.)

Applying the " 'reason to believe' rule" we adopted in *In re Dezi C.*, *supra*, 79 Cal.App.5th at page 779, review granted, we conclude the juvenile court did not commit reversible error. The Department's failure to make the requisite inquiries of daughter's extended family members was harmless because the

record does not provide a reason to believe daughter is an Indian child within the meaning of ICWA. Mother and father both reported that they had no known Indian ancestry, and neither parent was adopted such that "their self-reporting of 'no heritage' may not be fully informed." (*Ibid*.) Mother also makes no proffer on appeal that she or father have any Indian heritage. (See *id.* at pp. 779, fn. 4, 786.) As such, substantial evidence supports the juvenile court's order below.

## DISPOSITION

The May 6, 2021 order is affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

CHAVEZ, J.

HOFFSTADT, J.