Filed 10/3/23 In re W.J. CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re W.J., Person Coming Under the Juvenile Court Law. | B315345; B317391; B318454 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> K.J., <br><br> Defendant and Appellant. | Los Angeles County Super. Ct. No. 21CCJP00852 |

APPEAL from an order of the Superior Court of Los Angeles County, Kristen Byrdsong, Judge Pro Tempore. Dismissed in part and affirmed in part.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

In this consolidated appeal arising out of the dependency case concerning 11-year-old W.J., K.J. (mother) challenges the juvenile court's July 2021 order temporarily suspending her visitation with W.J.[1] She also challenges the order entered at the contested six-month review hearing held in January 2022, in which the court declined to return W.J. to her care based on its finding that doing so would place him at substantial risk of detriment, and ordered mother to have monitored visitation in a therapeutic setting when deemed appropriate by W.J.'s therapist.

The parties are familiar with the facts and procedural history of the case, so we do not fully restate those details here. Instead, in the Discussion, *post*, we discuss the facts as needed to provide context for and resolve the issues presented on appeal. As discussed below, we dismiss as moot the portions of the appeal relating to mother's visitation. We affirm the January 2022 order declining to return W.J. to mother's custody.[2]

---

[1] On December 28, 2022, this court granted mother's request to consolidate case numbers B315345, B317391, and B318454 for purposes of oral argument and decision. W.J.'s father is not a party to this appeal.

[2] At oral argument, mother, through counsel, asked that we continue the matter so she could speak on her own behalf. The request was denied as untimely because applications seeking to extend time must be presented beforehand in written form (see Cal. Rules of Court, rule 8.50(a) ["parties must serve and file all applications in the reviewing court"]), and at no point before argument did we receive a written application seeking the relief sought.

## DISCUSSION

### I.    Mother's appeal from the visitation orders is moot.

#### A.    Governing Principles

"A court is tasked with the duty "'to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" [Citation.] A case becomes moot when events "'render[ ] it impossible for [a] court, if it should decide the case in favor of [the party seeking redress], to grant him [or her] any effect[ive] relief.'" [Citation.] For relief to be 'effective,' two requirements must be met. First, the [party] must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the [party] seeks. [Citation.] [¶] This rule applies in the dependency context. [Citation.] A reviewing court must "'decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether [its] decision would affect the outcome in a subsequent proceeding.'"" (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).)

"Even when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute. [Citation.] As a rule, courts will generally exercise their discretion to review a moot case when 'the case presents an issue of broad public interest that is likely to recur,' 'when there may be a recurrence of the controversy between the parties,' or 'when a material question remains for the court's determination.'" (*D.P.*, *supra*, 15 Cal.5th at p. 282.) Specific to the dependency context, our Supreme Court has held that courts should consider the following factors when deciding whether to review a moot appeal:

(1) whether the challenged finding "'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' or "'could have other consequences for [the appellant][ ]"'" (*id.* at p. 285); (2) whether the finding was "based on particularly pernicious or stigmatizing conduct[ ]" (*id.* at pp. 285-586); and (3) "why the appeal became moot[,]" bearing in mind that "where . . . the case becomes moot due to prompt compliance by parents with their case plan, discretionary review may especially be appropriate." (*Id.* at p. 286.) "The factors above are not exhaustive, and no single factor is necessarily dispositive of whether a court should exercise discretionary review of a moot appeal." (*Ibid.*)

### B. Analysis

As noted above, mother challenges two orders relating to her visitation with W.J. Specifically, she seeks reversal of: (1) the July 2021 order suspending her visits based on the juvenile court's finding that visits with mother would be detrimental to W.J.'s mental and physical health; and (2) the January 2022 order permitting W.J. to have visits with mother in a therapeutic setting when deemed appropriate by W.J.'s therapist. In June 2023, however, the juvenile court ordered mother to have monitored visits with W.J. In so doing, the court effectively vacated the July 2021 order suspending mother's visits, along with the detriment finding on which it was based, and rendered irrelevant its January 2022 limitation on when visits were to resume. Under these circumstances, we conclude reversal of the disputed visitation orders will not "'have a practical, tangible impact on [mother's] conduct or legal status.'" (*D.P.*, *supra*, 14 Cal.5th at p. 277.) Thus, mother's challenges to those orders are moot. (*Ibid.*)

4

Having concluded this appeal is moot to the extent it concerns the prior visitation orders, we consider whether to exercise discretionary review of those portions of the appeal. On this point, mother appears to argue that we should review the disputed visitation orders because the juvenile court may rely on them to terminate her reunification services in the future.[3] Therefore, she argues, the challenged visitation orders will cause her "very real" prejudice. We reject mother's contention because, in future proceedings, mother can remind the juvenile court that the July 2021 and January 2022 visitation orders have been vacated.

None of the other factors discussed in *D.P.* demonstrate discretionary review is warranted. The challenged findings and orders were largely based on mother's repeated failure to follow visitation guidelines and court orders, as well as her inappropriate behavior with W.J. during visits. While these behaviors are concerning, we do not consider them so egregious to warrant review in this case. (See *D.P.*, *supra*, 14 Cal.5th at p.

---

3       The issue of mootness arose when, after the parties submitted their appellate briefs, the Department of Children and Family Services (Department) asked this court to take judicial notice of the juvenile court's minute order entered on June 9, 2023. Consequently, pursuant to Government Code section 68081, we asked the parties to file supplemental letter briefs addressing: (1) whether the juvenile court's June 2023 order reinstating mother's visits rendered her challenges to the July 2021 and January 2022 visitation orders moot; and (2) if the appeal is moot with respect to those prior visitation orders, whether this court should exercise its inherent discretion to consider her challenges to those orders.

286.) In addition, this case did not become moot due to mother's prompt compliance with her case plan. (See *ibid.*)

In sum, for the reasons discussed above, we dismiss as moot the portions of mother's appeal relating to the juvenile court's visitation orders entered in July 2021 and January 2022.

## II. Substantial evidence supports the juvenile court's finding that returning W.J. to mother's care would place him at substantial risk of detriment.

### A. Relevant Background

At the adjudication and disposition hearing held in May 2021, the juvenile court sustained the following allegations asserted in the petition filed on W.J.'s behalf under Welfare and Institutions Code[4] section 300: mother physically abused W.J. by placing him in the closet without food and intimidating him with a machete (counts a-1 and b-3); mother medically neglected W.J., a child with mental and emotional problems necessitating his hospitalization on prior occasions, and has a limited ability to provide appropriate care and supervision for him, as she failed to ensure his consistent participation in mental health treatment, failed to follow through on his medical appointments, and failed to give him his medication, causing his self-harming and aggressive behaviors to escalate (counts b-1, b-2, and c-1); mother placed W.J. in a detrimental and endangering condition by excluding him from his home and failing to make an appropriate plan for his ongoing care and supervision (count b-4); and mother's mental and emotional problems and failure to obtain

---

4    All further undesignated statutory references are to the Welfare and Institutions Code.

6

recommended mental health treatment render her unable to provide regular care and supervision for W.J. (count b-5).

The court then removed W.J. from his parents and granted mother reunification services. Her court-ordered case plan required her to participate in individual counseling, follow all recommendations offered by the expert who conducted a psychiatric evaluation of mother as ordered by the juvenile court under Evidence Code section 730, attend therapy with a licensed therapist, take all prescribed psychotropic medications, and attend conjoint counseling with W.J. when deemed appropriate. In addition, mother was ordered to complete six consecutive random or on demand drug tests, and to complete a full drug rehabilitation program if any test was missed or dirty. She was also directed to complete a developmentally appropriate parenting program, a program offered by the National Alliance on Mental Illness (NAMI), and an anger management program.

As noted above, at the six-month review hearing held in January 2022, the juvenile court declined to return W.J. to mother's care, finding that doing so would place him at substantial risk of detriment. In so doing, the court acknowledged that although mother apparently participated in some programs during the preceding review period, the Department could not verify whether those programs assisted her in addressing the issues requiring W.J.'s removal because she refused to sign the necessary information release forms, in violation of a prior court order. The court also questioned whether mother has benefited from her participation in services, as she continued to behave inappropriately during visits and disobey court orders.

7

## B.  Governing Principles and Standard of Review

At the six-month review hearing, the juvenile court must return the child to his or her parent's custody unless it finds, by a preponderance of the evidence, that doing so "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1).) "A substantial risk of detriment means that 'returning a child to parental custody represents some danger to the child's physical or emotional well-being.'" (*In re E.D.* (2013) 217 Cal.App.4th 960, 965 (*E.D.*).) The Department bears the burden of proving detriment. (*Ibid.*) "'In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services. [Citations.] The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement.'" (*Id.* at p. 966.)

"We review the juvenile court's finding of substantial risk of detriment for substantial evidence, which means evidence that is 'reasonable, credible, and of solid value[.]'" (*E.D.*, *supra*, 217 Cal.App.4th at p. 966.) The appellant "bear[s] the burden to show there was no evidence of a sufficiently substantial nature to support [the challenged] findings and orders. [Citation.] We draw all reasonable inferences from the evidence to support the findings and orders of the juvenile court and review the record in the light most favorable to the court's determinations; we do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the trial court's findings. [Citation.] Thus, we do not consider whether there is evidence from which the juvenile court could have drawn a different conclusion but whether there is substantial evidence

8

to support the conclusion that the court did draw." (*In re M.R.* (2017) 8 Cal.App.5th 101, 108.)

### C. Analysis

Mother argues the juvenile court erred by declining to return W.J. to her care at the six-month review hearing. Although not entirely clear, she appears to contend the record lacks sufficient evidence to support a finding that returning W.J. to her care would create a substantial risk of detriment to his physical or emotional well-being. For the reasons discussed below, we do not agree with her argument.

In asserting reversible error, mother largely contends the Department failed to ensure W.J. promptly received necessary mental health services while in its care and insists "she was quite capable, ready, willing, and able to provide for [W.J.'s] needs exponentially better than what he had received under the care of [the Department]." This argument misses the mark. In reviewing findings entered under section 366.21, subdivision (e)(1), our role is not to determine whether the Department made sufficient efforts to ensure W.J. received mental health services in a timely fashion. Instead, we must decide whether the record contains substantial evidence to support the juvenile court's finding that returning W.J. to mother would place him at substantial risk of detriment. (*E.D.*, *supra*, 217 Cal.App.4th at p. 966.) As discussed below, we conclude there is sufficient evidence to support the court's detriment finding.[5]

---

5     We acknowledge that, in asserting the juvenile court's detriment finding is unsupported by substantial evidence, mother also attempts to discredit the Department's status review reports and the Title XX records setting forth the Department's contacts with her. Her arguments are unavailing because they disregard

9

The record reflects mother was partially compliant with her court-ordered case plan. Specifically, it shows that during the relevant review period, mother received certificates of completion for a 12-week anger management program and two parenting courses. Throughout the review period, however, mother refused to speak to the Department about her participation in these programs or other services. Therefore, the Department was limited to the information available from mother's service providers to ascertain her progress in addressing the issues giving rise to jurisdiction. With respect to her parenting classes, the record shows that based on the limited information provided by mother, the Department was unable to determine whether the courses complied with its requirements and/or assisted her in addressing the issues necessitating W.J.'s placement. With respect to her anger management program, the Department spoke to the program director in October 2021, who confirmed mother's completion of 12 sessions but did not provide detailed information regarding her participation in the classes or her progress in addressing case issues.

In early January 2022, the Department spoke to mother's psychiatrist, who reported mother has been in her care for the last six to seven years. The psychiatrist related that "mother sought medication management to treat General Anxiety Disorder, ADHD[,] and PTSD[,]" that "mother was taking Zoloft and Adderall[,]" and that "mother was compliant with monthly

---

the applicable standard of review. As noted above, in reviewing for substantial evidence, "we do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the trial court's findings." (*In re M.R.*, *supra*, 8 Cal.App.5th at p. 108.)

10

sessions and [her] medication regimen." Subsequently, however, the psychiatrist acknowledged she "did not know the specifics[ ]" of W.J.'s dependency case, and did not opine on mother's progress in addressing case issues.

The record also contains three letters from mother's therapist, dated April 21, August 3, and October 6, 2021. These letters demonstrate mother has been working with her therapist since 2017, that the therapist has been treating mother for ADHD, anxiety, and PTSD, that she attended therapy on a weekly basis for most of 2021, and that mother was compliant with her medication as of April and October 2021. The letters do not, however, demonstrate that mother's therapist was aware of the issues giving rise to W.J.'s removal from mother's care. Nor do they elucidate what progress, if any, mother had made in addressing those issues. Further, the evidence shows the Department reached out to mother's therapist twice to discuss mother's participation in services, but was unable to reach the therapist.

Mother's participation in services is not dispositive of whether reunification would be appropriate. (See *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1139-1140 [holding a parent's "compliance with the reunification plan need not be the sole concern of the [juvenile] court, but it must be an indicium of progress toward family preservation"]; see also *id.* at p. 1143 [reiterating that a parent's compliance with the case plan is relevant to, but not determinative of, reunification, and that courts "must also consider the parents' progress and their capacity to meet the objectives of the plan[ ]"].) Despite her participation in the services noted above, the record demonstrates mother continued to engage in aggressive and

11

inappropriate behavior throughout the relevant reunification period. It also shows that her actions have negatively impacted W.J.'s well-being on several occasions.

Specifically, the record demonstrates that while W.J. was in his paternal grandparents' care, he often became upset while talking on the phone with mother because she repeatedly asked him questions he did not want to answer. In response to mother's behavior, W.J. would appear stressed and uncomfortable and begin fidgeting with the phone. He then either pushed the phone away or disconnected the call himself, and appeared to exhibit a sense of relief once calls ended.

Similarly, W.J.'s prior caregiver stated she often had to intervene in mother's calls with W.J. because mother made inappropriate statements about his caregivers, his grandparents, and Department staff. Mother responded to the caregiver's redirection with verbal aggression or additional inappropriate statements, which caused W.J. to appear fearful, angry, or nervous. After calls were ended due to mother's actions, W.J. engaged in negative behavior, such as burrowing his head under blankets, verbal aggression, isolating himself, crying, and self-injurious behaviors.

During an in-person visit with W.J. in July 2021, mother refused to comply with the Department's visitation guidelines and used her phone to video conference with a third-party while W.J. was present without the Department's prior approval. Mother refused to allow the Department social worker monitoring the visit to speak to the third-party and declined to explain why she required the third-party's virtual presence at the visit. When the social worker advised mother that the visit would be terminated unless she disconnected the call, mother still

refused to disconnect the call. At that point, the social worker ended the visit and asked W.J. to return to her car. W.J. initially complied, but mother immediately became upset, stated she was contacting law enforcement, and insisted that she was going to accompany W.J. to the car. In response, W.J. began yelling and crying, and pleaded with mother to disconnect the video call. He refused to go with the social worker, as he wanted to remain at the visit to spend time with his dog. At that point, mother agreed to disconnect the call and contacted law enforcement. W.J. was able to remain calm and continued with the visit.

Subsequently, law enforcement arrived and spoke to mother, who became argumentative. The officer also spoke to the social worker. As the visit continued, the social worker noticed mother had again initiated a video call with a third-party on her phone. At that point, the social worker ended the visit because, even though mother had been given a second chance, she still failed to comply with the visitation guidelines. W.J. then had an emotional breakdown, and began crying and yelling uncontrollably for his dog. A law enforcement officer helped the social worker bring W.J. to her car.

Upon returning to the home of W.J.'s paternal grandparents, W.J. refused to get out of the car and tantrummed for approximately 45 minutes. During his meltdown, he repeatedly and uncontrollably yelled for his dog, yelled at his grandparents, punched the windows of the social worker's car, and threw items from the vehicle into the street. When his paternal grandfather got into the backseat with W.J. in an attempt to de-escalate his behavior, W.J. reclined the passenger seat all the way back, trapping his grandfather in the car and hurting him. As the social worker attempted to open the

passenger door to help W.J.'s grandfather exit the vehicle, W.J. repeatedly hit and scratched the social worker's hands and arms. He then repeatedly hit his head on the vehicle's seats and rooftop, and also hit and scratched the vehicle's seats and door panels. Eventually, W.J. agreed to sit outside and calmed down. The record reflects that, before his visit with mother, W.J.'s behavioral issues had improved significantly. After the visit, however, W.J. "demonstrated declined behaviors[.]"

While mother's visitation was suspended, the juvenile court permitted her to have a monitored holiday visit with W.J., which took place on December 29, 2021. At the beginning of the visit, W.J. asked mother not to behave how she acted at their last visit in July 2021, noting she had been difficult. Mother denied engaging in inappropriate behavior during their last visit and remarked "'they' must have told him to say that to her." (Bolded text omitted.) She then gave W.J. several gifts, including, among other things, a journal, a cell phone, and a box she called a Love Box.

After the visit ended, W.J.'s caregiver informed the Department that the cell phone given to W.J. had its tracking notification turned on. The location of his placement, however, was to be kept confidential. The caregiver also related that the Love Box was a device that enabled mother to send messages to W.J., that the journal had mother's contact information inside of it, and that mother had given W.J. capsules containing rolled up pieces of paper with her contact information on them. Per the Department's instruction, the caregiver confiscated the devices given to W.J., causing him to become angry. In the days following his visit with mother, W.J.'s behavior worsened and resulted in his hospitalization on December 31, 2022.

14

At no point during the pertinent review period has mother acknowledged or taken responsibility for her actions giving rise to W.J.'s removal from her custody. Instead, mother has maintained W.J.'s removal was illegal, that the Department violated her rights, and that her son should return home because she can provide him with proper care. Moreover, as noted above, she has refused to speak to the Department about her participation in services, to sign the requisite information release forms, even though the juvenile court ordered her to do so in November 2021, or to follow the Department's visitation guidelines. She also denied engaging in improper behavior during her July 2021 visit with W.J. and has refused to accept that he has expressed unwillingness to speak to her on the phone. Further, mother has been aggressive with Department social workers when she has spoken to them. For example, during an in-person meeting in May 2021, she spoke to the Department social worker in a demeaning and disrespectful manner, raised her voice at the social worker, and hit the social worker on the arm when the social worker ended the meeting due to mother's behavior.

Based on the evidence discussed above, the juvenile court could reasonably conclude: (1) although mother may have participated in some services, she has not made substantial progress in addressing the issues requiring W.J.'s removal from her care; and (2) returning W.J. to mother's custody would create a substantial risk of detriment to his physical and emotional well-being. It therefore did not err by declining to return W.J. to mother's care at the six-month review hearing. (See § 366.21, subd. (e)(1); see also *In re Dustin R.*, *supra*, 54 Cal.App.4th at pp. 1133, 1139-1143 [affirming the juvenile court's detriment finding entered at 18-month review hearing where the evidence showed

15

the parents had not addressed the issues giving rise to jurisdiction even though they complied with their case plans].)[6]

6    Although not entirely clear, in her appellate briefs, mother appears to suggest the juvenile court erred by finding the Department provided her with reasonable services during the reunification period. On this point, mother has not presented any arguments supported by citations to the record or legal authority. We therefore conclude she has forfeited this contention and decline to consider it on the merits. (See *Benach* v. *County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["An appellant must provide an argument and legal authority to support his [or her] contentions. This burden requires more than a mere assertion that the [challenged order or] judgment is wrong. 'Issues do not have a life of their own: If they are not raised or supported by argument or citation to authority, [they are] . . . [forfeited]'"]; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 ["'The appellate court is not required to search the record on its own seeking error.' [Citation.] Thus, '[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been [forfeited]"].)

## DISPOSITION

The portions of the appeal challenging the visitation orders entered in July 2021 and January 2022 are dismissed as moot. The order entered at the six-month review hearing is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

CURREY, P. J.

We concur:

MORI, J.

ZUKIN, J.