Filed 10/6/23  In re F.Z. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re F.Z., a Person Coming Under the Juvenile Court Law. | H050519, H050534 (Santa Clara County Super. Ct. No. 21JD026877) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. X.H., Defendant and Appellant. | |

Appellant X.H. (Mother) appeals from an order terminating her parental rights as to F.Z. (appeal No. H050534).[1]  Mother contends the juvenile court erred in failing to apply the beneficial parental relationship exception.  (Welf. & Inst. Code, § 366.26,

---

[1] Mother filed a notice of appeal from a second order, denying a petition made under Welfare and Institutions Code section 388, which we designated appeal number H050519.  That appeal was ordered considered together with appeal number H050534 for record preparation, briefing, oral argument, and decision.  Mother did not address any alleged errors in the order denying the section 388 petition in her briefs on appeal, and as such we treat the issue as abandoned and will not address it on the merits.  (See *Santa Clara Valley Water District v. Century Indemnity Company* (2023) 89 Cal.App.5th 1016, 1055; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

subd. (c)(1)(B)(i).)[2]  The Santa Clara County Department of Family and Child Services (Department) contends that Mother failed to establish that the exception applied.  We conclude that the juvenile court did not abuse its discretion and affirm the orders.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[3]

Upon her birth in early 2021, F.Z. showed signs of mild tachypnea and premature birth.  She was admitted into the neonatal intensive care unit.  Mother suffered from ongoing, untreated substance abuse.  She tested positive for methamphetamines one week before F.Z.'s birth, and admitted to using methamphetamines during pregnancy in January and February 2021.  There was also a history of physical abuse by F.Z.'s father, L.F. (Father), against Mother, the most recent incident having taken place in December 2020, when Father assaulted Mother while she was pregnant with F.Z.  F.Z. was removed from her parents' custody and placed first in a confidential foster home, and shortly thereafter with her paternal great aunt, R.P., where she remained at all times relevant to this appeal.

### A.      *Visitation Between F.Z. and Mother*

After F.Z.'s initial detention, Mother was allowed to visit F.Z. in the hospital under hospital staff supervision.  Once F.Z. was placed in a foster home, Mother was afforded twice weekly supervised visits of two hours per visit.  Mother arrived on time for her visits, soothed F.Z. when she cried, changed her diaper as needed, and responded to her hunger cues.  Mother interacted with F.Z., and F.Z. "responded well" to the interactions.

---

[2] Subsequent undesignated statutory references are to the Welfare and Institutions Code.

[3] Because Mother's appeal raises only the issue of the beneficial parental relationship exception, we omit many of the facts related to her individual progress in her reunification plan and her section 388 petition as not relevant to our disposition.  As F.Z.'s father is not a party to this appeal, we focus our discussion on Mother and F.Z.'s relationship.

The Department placed F.Z. with R.P. in May 2021. Mother continued to have supervised visits twice a week, during which she "demonstrated appropriate behaviors and engagement" in the visits. However, she continued to struggle with sobriety. Prior to the six-month review hearing in October 2021, the Department reported that Mother consistently arrived late to her visits with F.Z. She otherwise engaged appropriately with F.Z., caring for her needs. The social worker indicated that F.Z. was "excelling" and "thriving" in R.P.'s home and had a "strong connection" with R.P. The juvenile court determined that F.Z. could not yet be returned to Mother, but it continued to offer Mother reunification services, and continued to allow Mother to have supervised visits with F.Z. two times a week for two hours per visit.

At the 12-month review hearing in June 2022, the Department recommended that the juvenile court terminate Mother's reunification services and set a selection and implementation hearing pursuant to section 366.36, as Mother continued to struggle with substance abuse, and continued to maintain a relationship with Father. Despite her struggles, the Department reported that Mother continued to maintain her visits with F.Z., and they were going well. Mother engaged with F.Z., including playing and reading with her, singing to her, and soothing her when she cried. Although the social worker had previously noted that F.Z. had difficulties transitioning to visits with her parents, the difficulties had decreased by the time of the 12-month review.

Mother opposed the Department's recommendation to terminate reunification services, and the juvenile court held a trial. The court determined that Mother had not made progress in resolving the problems that led to F.Z.'s removal from the home, and that there was not a substantial probability that F.Z. could be returned to her care within the statutory time. The court terminated reunification services and set a selection and implementation hearing pursuant to section 366.26. The court maintained Mother's supervised visitation with F.Z., at the same frequency of twice a week for two hours per visit.

Prior to the section 366.26 hearing, Mother filed a supplemental petition pursuant to section 388, asking the juvenile court to vacate the section 366.26 hearing and instead return F.Z. to Mother's care. The Department opposed the petition, contending that returning F.Z. to Mother would put F.Z. in danger of immediate harm and would not be in F.Z.'s best interest, as it would disrupt the stability and safety of her placement with R.P. The juvenile court denied Mother's request after holding an evidentiary hearing. It found that there was no change in circumstances and that it was not in F.Z.'s best interest to return to Mother's care. Regarding F.Z.'s best interest, the court noted that F.Z. had lived with R.P. for most of her life, had never lived in Mother's care, and that visitation had not progressed beyond supervised visits. Mother timely appealed the order (appeal No. H050519). (See fn. 1, *ante*.)

### B.      *Section 366.26 Hearing and Order*

In a report provided in October 2022, in advance of the section 366.26 hearing, the Department recommended adoption as the permanent plan for F.Z. The social worker reported that F.Z. had a "strong positive relationship and a secure attachment" with R.P. and her husband, the prospective adoptive parents, who F.Z. called " 'Mama and Papa.' " F.Z. was an "integral member" of R.P.'s family. The social worker observed that F.Z. was "comfortable in [R.P.'s] care as she seeks their attention, is affectionate, and follows their redirection. [F.Z.] appears to be happy and comfortable in the foster home . . . ." R.P. met all of F.Z.'s needs since the child's arrival at the home in May 2021, and looked forward to continuing to do so in the future.

The social worker opined that terminating Mother's parental rights and freeing F.Z. for adoption would not cause detrimental harm to F.Z. While Mother had "moderately consistent visitation" with F.Z., the social worker assessed that F.Z. had "not developed a substantial, positive, beneficial relationship [with Mother] in a way that would outweigh the benefits of adoption for her. Further, the permanency of adoption outweighs any potential harm of severing the relations of [F.Z.] with her parents." The

4

social worker indicated that Mother was appropriate with F.Z. during her visits, showing F.Z. affection and caring for her needs, and that F.Z. was calm and engaged with Mother during the visits. However, as F.Z. was out of Mother's care her entire life, she never depended on Mother "to meet her physical, mental, or emotional needs" and "never built a parent and child relationship with [Mother], where she could depend on [her] as [her] primary caregiver[]." F.Z. had not "presented to have any significant emotional attachment to [Mother], as evidenced by the lack of emotional distress in [F.Z.] on the days she does not see [Mother], or if there is an interruption in the visitation schedule due to a cancellation." The social worker recommended adoption for F.Z., as it "would allow her to gain a permanent, loving, and stable home with her prospective adoptive family" and "allow her to gain the peace of having a permanent home."

At the section 366.26 hearing, the Department reiterated its recommendation that the court terminate parental rights and free F.Z. for adoption, citing the factors set forth by the California Supreme Court in *In re Caden C.* (2021) 11 Cal.5th 614, 625 (*Caden C.*). The attorney appointed to represent F.Z. in the proceedings agreed with the Department's recommendation.[4] Mother opposed the recommendation and asked the court to find a beneficial parental bond exception under section 366.26, subdivision (c)(1)(B)(i). Relevant to this appeal, the court heard testimony from Mother and the supervising social worker assigned to F.Z.'s case, who the parties stipulated was an expert in the area of permanency planning for juvenile dependents.

Mother testified that she visited F.Z. twice a week, pursuant to the court order. During her visits, Mother played with F.Z. and provided food for F.Z. F.Z. called Mother "Ma." Mother learned during these visits about what foods, games, and stories F.Z. enjoys. Mother brought her two sons from a separate relationship to the visits on several occasions. She testified that her sons played with F.Z. and were eager to meet her. F.Z.

---

[4] Minor's counsel did not file a brief in the instant matter.

5

recognized the boys.  Mother indicated that she asked the social worker once or twice about increasing her visitation or making it unsupervised, but was told by the social worker that she could not make changes pending the section 366.26 hearing.

The social worker denied that Mother ever asked to increase her visitation with F.Z., although they may have discussed early on that Mother needed to engage in her case plan services and demonstrate progress in order to increase the visits.  The social worker personally observed approximately six of Mother's visits with F.Z.  She based the assessment in her report on her personal contacts as well as the notes prepared by those who observed Mother's remaining visits with F.Z.  The social worker testified that nothing indicated Mother was inappropriate during her visits with F.Z.

The juvenile court received into evidence the Department's October 2022 report (discussed *ante*), as well as two addendum reports addressing compliance with the Indian Child Welfare Act (ICWA),[5] and a report prepared by the Court Appointed Special Advocate (CASA).  The CASA indicated that F.Z. was in "a safe and loving environment with caregivers [R.P.] who invest in her well-being and future."  The CASA report does not reference Mother's relationship with F.Z.

Pursuant to the parties' stipulation, the juvenile court also admitted into evidence the visitation logs maintained by the Department concerning Mother's visitations with F.Z. from June through October 2022.  The logs generally reflected positive interactions between F.Z. and Mother.  They were playful and affectionate with each other.  There were times when Mother would be out of F.Z.'s sight and F.Z. would become concerned, or Mother would leave the room to use the restroom and F.Z. would try to follow her.  There were also occasions when F.Z. would gesture to be held by Mother.  However, the logs also reflected numerous instances where F.Z. would fuss or cry during the transition from R.P. to Mother.  Mother was able to comfort F.Z.  There is no record in the logs of

[5] The trial court determined ICWA did not apply in this matter.  The parties do not raise any ICWA issues on appeal.

6

F.Z. crying or fussing when transitioning back to R.P. from Mother. F.Z. would wave goodbye to Mother and blow kisses, often at R.P.'s prompting.

After taking evidence and hearing argument, the juvenile court adopted the Department's recommendation. It terminated Mother's parental rights and ordered adoption as the permanent placement plan for F.Z. The court indicated that it considered the factors set forth in *Caden C.* in evaluating Mother's contention that the beneficial parental relationship exception applied in F.Z.'s case. It first found by clear and convincing evidence that F.Z. was likely to be adopted. It then determined whether Mother met her burden to prove by a preponderance of the evidence that 1) she had regular visitation and contact with F.Z.; 2) there existed a relationship between her and F.Z., the continuation of which would benefit F.Z.; and, 3) whether the termination of the relationship would be detrimental to F.Z. The court found that Mother did regularly visit F.Z. However, it did not find that F.Z. had a substantial positive emotional attachment with Mother. Instead, it determined that the benefit F.Z. received from visits with Mother was the incidental benefit described in *In re Autumn H.* (1994) 27 Cal.App.4th 567 (*Autumn H.*), and that there was no evidence F.Z. would benefit from continuing the relationship. Even if she would benefit, the court found that any harm or detriment F.Z. would suffer if her relationship with Mother was severed did not outweigh the benefit she would receive in a new adoptive home.

Mother timely appealed from the order terminating her parental rights.

## II. DISCUSSION

On appeal, Mother contends the trial court erred in determining that the beneficial parental relationship exception did not apply. The beneficial parental relationship exception allows the juvenile court to decline to terminate parental rights and to select a permanent plan for the child other than adoption in situations where the parent demonstrates, by a preponderance of the evidence "[1)] that the parent has regularly visited with the child, [2)] that the child would benefit from continuing the relationship,

7

and [3]] that terminating the relationship would be detrimental to the child." (*Caden C., supra*, 11 Cal.5th at pp. 629–630.) "[This] exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Id*. at p. 630.)

We apply a "hybrid" standard to review the juvenile court's application of the beneficial parental relationship exception. (*Caden C., supra*, 11 Cal.5th at p. 641.) The substantial evidence standard applies to the first two elements. (*Id*. at pp. 639–640.) As to the third element, we review the trial court's factual determinations for substantial evidence, but review the ultimate decision—whether terminating parental rights would be detrimental to the child—for abuse of discretion. (*Id*. at p. 640.) Where, as here, the trial court concludes that appellant did not carry the burden of proof at the hearing below, "we ask 'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation.]' [Citation.]" (*In re S.G.* (2021) 71 Cal.App.5th 654, 671.)

### A. *Mother did not Demonstrate that F.Z. Would Benefit from Continuing the Relationship with Mother*

It is undisputed that Mother had regular visits and contact with F.Z. However, the court found that the nature of Mother's relationship with F.Z., while positive, was "incidental," and not sufficiently substantial to meet the burden established in *Caden C.* Based on these observations, the court concluded that Mother had not established that F.Z. would benefit from continuing a relationship with her. This finding is supported by substantial evidence.

To successfully show a beneficial relationship, a parent "must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.,*

*supra*, 11 Cal.5th at p. 636.)  Whether continuing a relationship with the parent is in a child's best interest depends on many factors:  the age of the child, the portion of the child's life spent in the parent's custody and the effect interaction with the parent has on the child.  (*Autumn H., supra*, 27 Cal.App.4th at p. 576.)  Courts can "consider how children feel about, interact with, look to, or talk about their parents [citations]," and can rely on observations of others who have observed visitation to formulate conclusions. (*Caden C.,* at pp. 632–633.)  Here, those who had observed Mother's visits with F.Z. indicated that they were consistent and "overall . . . [went] well."  The Department described Mother as appropriate, engaged, affectionate, and attentive to F.Z.'s needs during visits.  F.Z. was "calm and engaged" during the visits.  On the other hand, F.Z. did not show any signs of distress when separating from Mother at the conclusion of a visit, had never lived with Mother and their visits never progressed past supervised visitation.

While the foregoing points to a loving and affectionate relationship with F.Z., the evidence is reflective of the "incidental benefit" that "[i]interaction between natural parent and child will always confer" (*Autumn H., supra*, 27 Cal.App.4th at p. 575), rather than the "substantial, positive, emotional attachment to the parent" required by the exception (*Caden C., supra*, 11 Cal.5th at p. 636).  "Interaction between natural parent and child will always confer some incidental benefit to the child.  The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.  [Citation.]  The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.]  The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Autumn H.*, at p. 575.)  Here, the record does not include evidence of day-to-day interactions and shared experiences beyond those incidental to the twice weekly supervised visits shared between Mother and F.Z.

9

Mother likens the facts of her case to those in *In re A.L.* (2022) 73 Cal.App.5th 1131, 1155 (*A.L.*), wherein a panel of this court found substantial evidence supported the trial court's express finding that the father in *A.L.* met his burden to show a substantial, positive emotional attachment between the child and the father. But in *A.L.*, the child was three years old at the time of removal, at which time the child was living with the father. (*Id.* at p. 1137.) The father was the sole provider and caretaker for the child up to that point. (*Id.* at pp. 1139, 1148.) The child was old enough to tell the social worker how she felt about her living situation. (See *id.* at pp. 1141, 1142.) There was evidence that the child "looked forward to" the visits with the father and was "very attached" to him. (*Id.* at pp. 1144, 1148.) By contrast, here F.Z. has lived out of Mother's care since she was two days old, living with R.P. since she was two months old. While there is evidence that F.Z. enjoyed her time with Mother during the supervised visits, there is no evidence she "looked forward to" the visits prior to seeing Mother, or that she had any attachment to Mother outside of the limited time spent in the supervised visitations.

Mother argues that the juvenile court's analysis of this factor was "cursory," citing *In re M.V.* (2023) 87 Cal.App.5th 1155, 1184 (*M.V.*). In *M.V.*, the juvenile court acknowledged that the child wanted to remain in contact with her parents and live with both her parents and her caretakers, and that she would be sad if she could not see her parents again. (*Id.* at p. 1184.) The court then moved on to the third, detriment element, before it "caught itself" and stated that there was clearly a bond with the child and parents. (*Id.* at pp. 1184–1185.) This was all it said about the beneficial continuing relationship element of the analysis, thus causing the appellate court to describe the analysis as "cursory," and state, "The court does not appear to have evaluated the quality of the parent-child relationships or to have considered factors such as M.V.'s age, how much of her life she spent in her parents' custody, the positive or negative effects of interaction with the parents, and M.V.'s particular needs. [Citation.] This was error." (*Id.* at pp. 1184–1185.)

The juvenile court here did not similarly err, but conducted a thoughtful review of various factors.  It considered F.Z.'s age, the amount of time she spent out of Mother's custody in her young life, the positive nature of her interaction with Mother during her visits, the normal amount of fussiness expected from a 19-month-old child, and F.Z.'s particular needs—notably her need for permanency.

Given this, substantial evidence supports the juvenile court's finding that Mother failed to demonstrate that F.Z. would sufficiently benefit from continuing their relationship.

### B.      *Mother did not Demonstrate Detriment to F.Z.*

Even if we were to conclude that the trial court's finding regarding Mother's beneficial relationship with F.Z. was not supported by substantial evidence, Mother failed to show that severing the parental relationship would be detrimental to F.Z.  In evaluating whether termination would be detrimental to the child, a court must decide whether the harm from severing the parental relationship outweighs the benefit to the child of placement in a new adoptive home.  "By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Caden C.*, *supra,* 11 Cal.5th at pp. 631–632.)  The juvenile court may consider emotional instability and preoccupation with the parent leading to acting out, difficulties in school, insomnia, anxiety, or depression.  The court may also assess whether "a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Id.* at p. 633.)  " 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights. . . .  When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh

11

its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent. [Citation.]" (*Id.* at pp. 633–634.)

The court juvenile court here considered F.Z.'s life without her relationship with Mother, and determined that it would "not be much different" and she would continue to "thrive and blossom." It found that the harm of severing the relationship "does not outweigh the security and the sense of belonging that a new family will confer." Specifically, the court considered whether F.Z. would suffer any emotional instability in the future as a result of terminating her relationship with Mother and determined "that the stable home she is currently in, that the Court expects she will continue to be in, will take the edge off any harm that might come from terminating parental rights."

Mother asserts that the record here is replete with evidence of the detriment F.Z. would suffer if her relationship with Mother is severed, noting that F.Z. would reach for Mother and receive comfort from Mother during her visits. However, the record is also replete with evidence that F.Z. suffered no detriment when her visits with Mother ended. She easily returned to R.P., waving goodbye to mother with no noted difficulties. There is no evidence that F.Z. suffered in Mother's absence during times she did not see Mother, or that F.Z. missed her or had difficulties during the majority of the time that F.Z. was not with Mother. Rather, the evidence demonstrates that F.Z. was a calm, happy child who was thriving in her home with R.P.

In finding that Mother failed to show that terminating parental rights would be detrimental to F.Z., the juvenile court did not apply incorrect criteria, as suggested by Mother in her reply brief. It did not require a showing that F.Z. was primarily bonded to Mother. (*In re D.P.* (2022) 76 Cal.App.5th 153, 168.) Nor did it compare Mother's attributes as a custodial caregiver relative to those of R.P. (*In re M.G.* (2022) 80 Cal.App.5th 836, 851.) The juvenile court properly considered "whether terminating parental rights serves the child's best interests." (*Caden C., supra*, 11 Cal.5th at pp. 631–632.) Based on the evidence before it, the court determined that Mother failed to meet

12

her burden on this factor. Given the highly deferential abuse of discretion standard, we cannot substitute our judgment for that of the juvenile court regarding the child's best interests. (*Id.* at p. 641.) With only limited evidence of detriment, the juvenile court was justified in finding that Mother presented insufficient evidence that terminating parental rights would be detrimental to F.Z. As Mother failed to establish all the elements of the beneficial relationship exception, the court did not abuse its discretion in rejecting the exception and terminating parental rights.

## III. DISPOSITION

The November 1, 2022 order denying Mother's section 388 petition is affirmed (appeal No. H050519).

The November 7, 2022 order terminating Mother's parental rights is affirmed (appeal No. H050534).

_____

Greenwood, P. J.

WE CONCUR:

_____

Danner, J.

_____

Lie, J.

H050519, H050534

In re F.Z., Santa Clara County DFCS v. X.H.